UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

        Plaintiff,                    Criminal No. 16-cr-20552
                                              Criminal No.  17-cr-20235

v.                                    Honorable Arthur J. Tarnow

D-1 SEBASTIAN GREGERSON,
  a/k/a Abdurrahman Bin Mikaayl,

        Defendant.

_____/

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its undersigned attorneys, respectfully submits this memorandum to inform the Court of its position at sentencing.[1]  In light of the factors set forth in 18 U.S.C. § 3553(a), the government submits that sentences of sixty months imprisonment in case number 16-cr-20552 and twelve months imprisonment in case number 17-cr-20235 are necessary to protect the public and to deter future criminal conduct.  The defendant is a supporter of the Islamic State of Iraq and al-Sham (ISIS) who considers himself a soldier in an ongoing war against those opposed to ISIS.  He equipped himself with military weapons, including high explosive grenades, and an armory of other weapons in preparation to engage in

---

[1]  The government has filed a supplement to this memorandum under seal.

violent acts, consistent with ISIS's instructions to prepare for violent attacks against ISIS's enemies.

## FACTUAL BACKGROUND

### I.    The Defendant's Alignment With ISIS

The Detroit FBI began investigating Sebastian Gregerson in April, 2015, after a citizen, a fellow Muslim, told the FBI that Gregerson repeatedly expressed support for ISIS and its violent methods and continually accessed ISIS-related web sites. According to this individual (hereinafter "source"), Gregerson indicated that he wanted to move his family to ISIS-held territory and had evicted his wife's relatives from his home during a visit, claiming that they were not true Muslims or "takfeer." The source further stated that Gregerson claimed to have grenades and a bazooka (a shoulder-type rocket launcher).[2]

Investigators subsequently identified the Facebook account of the defendant, which had the user name, "Abdurrahman Bin Mikaayl."  The defendant's use of an alias was an apparent effort to disguise his association with the ISIS-related content contained on the Facebook page.  The defendant had another Facebook account in the name of "Sebastian Gregerson."  Unlike the Abdurrahman Bin Mikaayl account, no ISIS-related content was posted on that account.

---

[2] During a search of the defendant's residence in July, 2016, law enforcement found components to construct grenades, as well as a 37mm grenade launcher.  (Exhibit A: photo of recovered 37mm grenade launcher.)

Investigators found that, from at least June, 2015, to May, 2016, the defendant's Abdurrahman Bin Mikaayl Facebook profile page displayed soldiers on horseback, armed and dressed for battle, and carrying the ISIS flag. (Exhibit B). The defendant's Facebook posts also reflected his support for ISIS. On November 13, 2015, ISIS attacked Paris in a coordinated series of suicide bombings and mass shootings, resulting in 130 deaths. On the day following the attack, the defendant wrote a Facebook posting, indicating his belief that the terrorist attacks were legitimate in a time of "war." (Exhibit C).

The defendant's email account also reflected the defendant's support of ISIS. On January 7, 2015, two brothers armed with assault rifles and other weapons attacked the Paris office of *Charlie Hebdo*, the French satirical newspaper, killing 12. On the same day, the defendant wrote an email, (Exhibit D), stating "Allahu akbar" ["God is great"] to a radical former Imam in Maryland whose own Facebook postings revealed staunch support for ISIS.

The defendant also sent several emails from February, 2015, to March, 2016, praising ISIS actions with "Allahu akbar" written in the subject line and, in the body of the emails, transmitting links to articles relating to ISIS, such as "ISIS accepts allegiance of Nigeria jihadists Boko Haram." (Exhibit E.1-E.9). Gregerson sent an email on March 19, 2016, which had the symbol of a smiling face in the subject line; in the body of his email was a link to an article about the ISIS suicide bombing attack

3

on a checkpoint in the Sinai Peninsula which killed thirteen police officers. (Exhibit E.2).

In December, 2014, a Royal Jordanian Air Force Pilot was shot down over Syria while participating in airstrikes against ISIS targets. On February 3, 2015, ISIS put the pilot in a cage, doused him with a flammable liquid, and set him on fire, burning him alive. The fire was finally extinguished when ISIS used a truck to dump a load of rubble on the pilot's body. ISIS videotaped the murder. On the same day that ISIS released the video, February 3, 2015, Gregerson wrote an email to a fellow ISIS supporter justifying the murder under Islamic law. (Exhibit F). In doing so, Gregerson echoed the justification ISIS gave at the time.

The defendant was an avid consumer and disseminator of ISIS's violent propaganda. Gregerson downloaded onto his iPad every issue of ISIS's former official English language publication, *Dabiq,* published up to the time of his arrest. (Exhibit G). Issues of *Dabiq* include graphic photographs of ISIS beheadings and other murders, theological justifications for murdering anyone who does not share ISIS's radical ideology, and glowing biographical accounts of individuals who killed in the name of ISIS, like the San Bernadino killers, with an expressed hope that they would inspire more "lone wolf" attacks.

Email records showed that the defendant regularly disseminated *Dabiq* to others via his email account during the time period from December 29, 2014, to

March 31, 2015.  (Exhibit H.1-H.6).[3]  The recipients of these emails were fellow ISIS-supporters, including the ISIS supporter and former Imam in Maryland.

The defendant confirmed his support for ISIS in recorded conversations with an FBI agent acting in an undercover capacity (UCE), who the defendant believed to be a like-minded ISIS supporter.  During a conversation on April 28, 2016, the defendant claimed to have listened to all of the lectures of now-deceased radical al-Qaeda cleric, Anwar al-Awlaki.  During the search of the defendant's residence, law enforcement recovered 96 CDs containing lectures of Anwar al-Awlaki.

Al-Awlaki was a key leader in al-Qaeda in the Arabian Peninsula (AQAP) who was killed in a U.S. drone strike in 2011.[4]  In his publications and videos, Awlaki called for violent attacks against America, justifying such attacks in the name of extremist ideology.  All of the terrorists who committed major attacks in the United States over the past several years have been consumers of Awlaki's violent messages.[5]

---

[3]  Notwithstanding the overwhelming evidence found on the defendant's iPad and within his email account, the defendant denied to the Probation Department that he read or disseminated *Dabiq.*

[4]  Awlaki played an operational role in the plot by Umar Farouk Abdulmutallab to bomb a U.S. airliner over Detroit on Christmas Day, 2009.  *United States v. Abdulmutallab*, Crim. No. 10-cr-20005-01 (E.D.Mich.), Gov't Sentencing Memo., Supp. Factual Appx. at 12-14.

[5]  Open source information confirms that each of the perpetrators of the major terrorist attacks in the U.S. indicated below was a consumer of Al-Awlaki's lectures or writings:

- Faisal Shahzad, Times Square Bombing (2010)
- Tsarnaev brothers, Boston Marathon Bombing (2013)
- Rizwan Farook and Tashfeen Malik, San Bernardino Shooting (2015)

During the April 28, 2016, conversation with the UCE, the defendant referenced the June, 2014, speech by Abu Bakr al-Baghdadi, the leader of ISIS, after ISIS's takeover of Mosul, Iraq in which he declared the establishment of a caliphate, an Islamic state led by a religious leader. The defendant told the UCE that he watched al-Baghdadi's speech some five times that day and celebrated the event with associates. The defendant stated: "We could not stop smiling."

Gregerson told the UCE he watched ISIS videos, including suicide videos, and read ISIS publications in different languages. In conversations with the UCE, the defendant referred to individuals who carried out terrorist attacks on behalf of ISIS as "brothers" and used the collective "we" in referring to ISIS, (" . . . now we're starting to rack up some casualties . . . ") (June 21, 2016). The defendant employed the same terms as ISIS, revealing his agreement with their extremist ideology, for example, using the derogatory term, "rafidi," in reference to Shia Muslims, and "jihad in the cause of Allah" – an exhortation found in ISIS propaganda. Like ISIS, the defendant extolled the virtues of Sharia law – one of the tenants of ISIS ideology.

- Elton Simpson, Muhammed Cartoon Attack (2015)
- Muhammad Abdulazeez, Chattanooga Recruiting Center Shootings (2015)
- Abdul Artan, Ohio State University attack (2016)
- Ahmad Khan Rahimi, NY and NJ Bombings (2016)
- Omar Mateen, Orlando Night Club Shooting (2016)

The defendant also applauded ISIS's advances. Commenting on ISIS's offensive against U.S.-led coalition forces in Syria, the defendant stated on June 26, 2016, "they're hitting back, they're hitting back . . .  It's beautiful."

## II.    ISIS and the Defendant's View Of An Ongoing War and the Need To Prepare For Violent Action.

ISIS believes that there is an ongoing war between "believers," those who share ISIS's radical ideology, and "infidels," those who do not.  ISIS considers those that perpetrate terrorist acts inspired by ISIS as its "soldiers."[6]  The defendant shares the ISIS view that there is an ongoing war between these two groups and aligns himself with ISIS in that war.  The defendant's statements also make clear that, in his mind, ISIS-inspired terrorist attacks are justified because the world is at war, and the defendant, himself, is a soldier in that war.

- In conversations with the UCE, the defendant indicated that the world is divided into infidels and believers, the United States being the "land of the infidels."

- During a conversation with the UCE on July 20, 2016, the defendant discussed a prisoner in Guantanamo who was charged with the attempted murder of U.S. soldiers.  Gregerson referred to the prisoner as a "brother" and criticized the charges, saying that "it's a war" and "you can't charge somebody with murder in a war."  "He's a soldier . . . Regardless of whether he

---

[6]  For example, after the May 22, 2017, attack at a concert venue in Manchester, England, which killed 22 people, ISIS issued a public statement through its official A'maq news agency, claiming that the perpetrator of the attack was a "soldier of the caliphate." https://news.siteintelgroup.com/Jihadist-News/is-claims-credit-for-manchester-bombing-killing-and-wounding-nearly-100.html

attacked [a U.S. soldier] or not, it's not . . . attempted murder. This is war."

- On November 14, 2015, the defendant defended the Paris terrorist attacks on his Facebook page, writing, "the world is at war."

- On July 15, 2016, in justifying the terrorist attack in Nice, France, the defendant stated, "This is called total war, you know."

The defendant views himself a "soldier" fighting against the enemies of ISIS, including the United States. This is reflected most clearly in statements he made to his wife during a jail call on September 1, 2016, shortly after his arrest. The defendant told his wife that he considered himself a "P.O.W.," that is, a prisoner of war, or soldier who has been imprisoned by an enemy nation.

## III.  The Defendant Provisioned Himself with Weapons and Ammunition in Preparation for Violent Action, as Directed By ISIS

Gregerson was far more than a kindred spirit of ISIS. He took extensive steps to carry out a central ISIS directive. ISIS has exhorted its followers in western countries to equip themselves with weaponry, to cache weapons, and to otherwise prepare themselves for battle in the ongoing war with their "enemies." In March, 2015, ISIS released an e-book entitled, "How To Survive in the West, A Mujahid Guide (2015)." (A "mujahid" is a jihadi fighter.) ISIS exhorted those living in western countries to make preparations for jihad, including stockpiling weapons. Once preparations are made, the ISIS manual instructs that "You are now your own

one man army! . . . and your job now is to support the Jihad . . . you can start a 1 or 2 man Jihad like the Kouachi brothers did, [the men responsible for the Charlie Hebdo killings in Paris, in January, 2015] . . . " ("How To Survive in the West," p. 53). "Your only connection to the Islamic State is ideological. You earn money, collect weapons, and use anonymity to support any Jihad which may arise in the future, or to do your own 1 or 2 man Jihad." *Id.* at 54. On or about March 17, 2015, the defendant sent an e-mail to others with a link to the translation of a speech by then ISIS second-in-command, Abu Mohammad al-Adnani, entitled "So They Kill and Are Killed," in which Adnani called on followers – "soldiers" – to "mobilize for jihad," also commanding: "O mujahidin, then rise towards your enemies and intrude upon them…" (Exhibit I).

The defendant prepared himself, as ISIS directs, amassing an arsenal of weapons. In the sixteen months preceding his arrest, from approximately April, 2015, to July, 2016, the defendant purchased multiple weapons, including multiple fixed-blade knives of significant length, several hundred rounds of AK-47 ammunition, an underground ammunition storage cache, tactical gear, tactical training materials, a balaclava mask, commercial grade road spikes, and an AK-47 training video. During the execution of a search warrant at the defendant's residence after his arrest, investigators found these items and more, recovering a total of ten firearms, consisting of eight long guns (assault rifles and shotguns) and two hand

guns, a hatchet, two machetes, multiple long, fixed-blade knives, nearly 8,000 rounds of ammunition, as well as a 37mm grenade launcher and 37mm flare rounds. (Exhibit J: photographs of items seized).

Significantly, the pattern and nature of the defendant's weapons purchases appear to have changed around 2015, during the same time period his alignment with ISIS became increasingly manifest. While Gregerson purchased knives from 2008 through 2013, he bought only one a year except in 2009 and in 2014 when he purchased none. By contrast, in 2015, the defendant purchased fifteen knives and two training knives. Many of those knives are specifically marketed for tactical, that is, combat, utility. (Exhibit K: Online tactical descriptions and dates of Gregerson's purchases of combat knives.)[7]  These purchases roughly coincide with a flood of ISIS propaganda which encouraged followers to commit knife attacks.

The defendant's purchase of firearms also appeared to accelerate shortly before his arrest in July, 2016. In the six years prior to his arrest, the defendant purchased one or no guns each year. Then, in a two-week period in June, 2016, Gregerson purchased three guns. Two were long-barreled guns.

---

[7]  The defendant denied to the Probation Department that he purchased knives specifically marketed for tactical use.

## A.    The Defendant's Efforts to Obtain Military Weapons

The FBI's concerns about Gregerson grew as the investigation confirmed the source's information that Gregerson was an avid ISIS supporter and as the FBI discovered he was in the process of purchasing multiple weapons, a vast amount of ammunition, tactical gear, and tactical training materials – purchases which appeared to be escalating, absorbing a greater percentage of the defendant's small income, and changing in nature by becoming more tactical.  In April, 2016, a UCE was introduced to Gregerson in an effort to determine his intentions.  During a three-month period, from April, 2016, to July, 2016, Gregerson and the UCE met on ten occasions.  The discussions between Gregerson and the UCE were all recorded.

It became apparent early on in those discussions that the defendant had a strong interest in weapons generally, and grenades, in particular.[8]  The defendant took on a teaching role, instructing the UCE about grenades and grenade-related weapons.

---

[8]  Gregerson had acted on this interest well before the UCE entered the picture.  The source related to the FBI in April, 2015, that the defendant claimed to have grenades.  The components to construct homemade fragmentary grenades found in the defendant's residence were acquired before any interaction with the UCE.  In conversations with the UCE, Gregerson exhibited in depth knowledge about grenades, including how to make homemade illegal grenades – knowledge acquired before the appearance of the UCE.  The defendant also researched 40mm military grenade launchers long before he met the UCE, as one of the computers recovered from his residence revealed. Ebay results also showed that the defendant had already purchased military vests to hold illegal grenades before meeting the UCE.

During their third meeting on May 1, 2016, grenades were discussed for the first time.   Gregerson told the UCE that he possessed a 37mm grenade launcher,[9] which is not *per se* illegal.   This type of launcher is typically used by law enforcement to launch smoke or percussion grenades.[10]   He also described to the UCE what tactics he would employ to commit an attack on a building using 37mm grenades.   " . . . if I lob it into a building, in, I'm talking about interior use . . . By the time you lob it through, and then you walk over there, when you get inside everybody's all disoriented . . . I really think that would be devastating . . . or you could go with the old pull the pin and roll in the smoke, you know."   During the same conversation, the defendant also told the UCE that obtaining high explosive ("HE") grenades would be illegal and proceeded to explain how he could make homemade grenades of this type with 37mm grenade shells.

After the May 1, 2016, meeting, the defendant and UCE did not meet again until June 21, 2016, over seven weeks later.   In that conversation, the defendant described in detail the process of altering 37mm rounds into illegal, fragmentary grenades by inserting into the rounds buckshot, flechettes (arrow-shaped metallic

---

[9]   Gregerson correctly noted that that this is "technically a gas gun," but it is commonly referred to as a grenade launcher.   See, e.g., http://www.brownells.com/items/37mm-grenade-launcher.aspx; https://en.wikipedia.org/wiki/37_mm_flare (noting, type as "grenade launcher").

[10]   A 37mm launcher is not an item that is typically used for any recreational purpose.   It is also not typically used to launch flares, the type of 37mm rounds that were found in the defendant's residence.   Flare rounds are usually used as a distress signal by boaters or campers in a smaller launcher in the style of a handgun.

objects), or pellets – objects which act as indiscriminate shrapnel.[11]  The defendant

used technical terms consistent with someone who has researched the topic and had

working familiarity with the process.  He further specified that one would use these

illegal, homemade rounds "indoors," to "clear places out" and "to hit," after which

Gregerson paused briefly and finished his thought by saying, "gathering, you know

what I mean."[12]

In the same conversation, the defendant talked knowledgeably about an

American Specialty Ammo ebook which described the process for altering 37mm

rounds into illegal grenades by inserting buckshot and flechettes.  The defendant

indicated that such a modified 37mm round is "highly illegal, it's a destructive

device."  The defendant went on to explain the benefits of having all of the parts

necessary to modify 37mm rounds but not assembling them to prevent being caught

with such a device.  Assembly, according to the defendant, could be done quickly

and easily.  (Exhibit L).

When law enforcement executed a search warrant at the defendant's residence

on July 31, 2016, investigators recovered ten 37mm rounds containing pyrotechnic

material (flare rounds) in a shipping box from American Specialty Ammo, a 37mm

grenade launcher, and numerous rounds of shotgun shells containing metal buck shot

---

[11]  Exhibit L, June 21, 2016, Transcript, pp. 52-54.
[12]  Exhibit M: June 21, 2016, Transcript, p. 59.

pellets – the components for the type of homemade destructive devices described by Gregerson.

During the June 21, 2016, conversation, Gregerson and the UCE discussed 40mm grenade launchers.  Gregerson accurately explained to the UCE that a 40mm grenade launcher is a "destructive device" and, to be legally possessed, must be registered with ATF.  Gregerson suggested that they use the code term, "M80s," when talking about 40mm grenades, which are fired from a 40mm grenade launcher and which are also illegal to possess unless registered.

During the same conversation, the UCE indicated that he had a contact who worked in a gun shop on a military base. The UCE and Gregerson then discussed the possibility of obtaining a 40mm launcher for Gregerson. Gregerson expressed his interest in obtaining a particular type of 40mm grenade launcher that could be mounted on a rifle, describing the configuration as being "made for combat." Gregerson also indicated he wanted to buy 40mm grenades for the 40mm launcher. Gregerson gave parting instructions to the UCE: "You've got an intel mission here now, tracking down…tracking down some merchandise" -- an apparent reference to the UCE using his network to obtain a 40mm grenade launcher and 40mm grenades.

A 40mm grenade has a 142-yard casualty-producing radius and a kill radius of 5.5 yards.[13]

At their next meeting on July 5, 2016, Gregerson asked the UCE whether he had "put any more thought into that piece of merchandise," referring to the 40mm grenade launcher and grenades.  Gregerson said that he had been thinking about some of the complications with the initial plan and offered a different plan: "I've got another proposal, see what you think of this, what your take is on this," and asked the UCE: "what do you think would be the possibility of sixty-sevens being easier," noting that there would not be any equipment needed to go along with it.  Gregerson was referring to M67 fragmentation grenades, which are thrown by hand and do not require a launching device.  Gregerson also proposed that the UCE's military contact should first provide Gregerson with smoke grenades, which are legal, and then "ease them in to the sixty-sevens." Gregerson instructed the UCE: "Find someone who has their hands in the places where both of those things come from," that is, someone who had access to both smoke grenades and M67 high explosive grenades.[14]

---

[13]  Dept. of Army Field Manual, February 13, 2003 edition, 3-22.31 at 3-9.  A casualty-producing radius is a radius from the point of detonation in which at least fifty percent of standing individuals are killed or incapacitated.

[14]  Exhibit N, July 5, 2016, Transcript, pp. 179-185.  The defense claimed to the Probation Department that the defendant's alternate proposal was to have the UCE get him (legal) smoke grenades *instead* of (illegal) high explosives grenades.  This is not true.  As the transcript reveals, the defendant wanted both smoke grenades and M67 high explosive grenades.

Gregerson also indicated that he was interested in purchasing five M67 grenades as a start.

Three days later, on July 8, 2016, the UCE told Gregerson that the M67 grenades would cost 75 to 100 dollars each. Gregerson told the UCE to "start with some eighteens," a reference to M18 smoke grenades, and then they would "go from there." Gregerson stated: "It's a good way to test the waters" – an apparent desire to test the UCE's military connection and make sure everything went smoothly with smoke grenades first and then proceed to the purchase of the M67 grenades.

On July 15, 2016, the UCE told Gregerson that his contact might be coming into town soon and asked Gregerson if he was interested in obtaining two smoke grenades for $50.00. They also discussed the "next round after that," and Gregerson's desire to use his Beretta M9 handgun as payment for the M67 grenades.[15]

On July 27, 2016, the UCE explained to Gregerson that the shipment of smoke grenades and the M-67 fragmentary grenades would be coming on Sunday, July 31, 2016, and that the two transactions could take place between then and Monday, August 1, 2016. The transaction with the two smoke grenades would proceed first

---

[15] Exhibit O, July 15, 2016 Transcript, pp. 194-200. The defendant claimed to the Probation Department that, on this date, he only agreed to purchase smoke grenades. This is also not true. The transcript shows that Gregerson discussed both his desire to purchase smoke grenades and high explosive grenades.

on Sunday.   If Gregerson was satisfied and wanted to proceed with the purchase of the M67s, those items would be available until Monday morning.  Gregerson could also opt to proceed with the purchase of the M67s on Sunday night after inspecting the smoke grenades. "It's completely your call," the UCE told Gregerson.[16]  The men further discussed the mechanics of how the transactions would occur, with Gregerson conducting counter-surveillance for the UCE while the UCE retrieved the grenades from his contact at a highway stop.

On July 31, 2016, Gregerson and the UCE met at a gas station in Monroe, Michigan.  A second UCE (UCE #2), whom Gregerson believed to be the UCE's associate and a truck driver, was also present.  Gregerson arrived at the meeting with the Beretta M9 handgun he wanted to use as payment for the M67 fragmentation grenades.  The UCE reiterated that UCE #2 would be in the area until the following day so Gregerson had the option of waiting to decide whether he wanted to purchase the M67 grenades.  Gregerson indicated that he would rather go ahead with the purchase of the M67 grenades then and there, "as long as it looks clear." [17]

The UCE then retrieved two smoke grenades from UCE #2 and delivered them to Gregerson, who inspected them.  Gregerson indicated his desire to the UCE to proceed with the deal for the M67 fragmentation grenades.  "I'm good for round

---

[16]  Exhibit P, July 27, 2016 Transcript, pp. 169-70,173-76.
[17]  Exhibit Q, July 31, 2016, Transcript, at 12.

two," he said.[18] Gregerson gave the handgun to the UCE, who again walked to UCE #2's truck and delivered the gun to UCE #2.  The UCE left the handgun with UCE #2 and returned to Gregerson's vehicle with a container that included the grenades.  The UCE delivered the grenades to Gregerson, who inspected them and was subsequently placed under arrest.[19] (Exhibit R: photos of grenades).

According to the FBI Laboratory Division, Explosives Unit, an M67 grenade has a killing radius of 16.4 feet and a casualty-producing radius of 49.2 feet, although fragments can disperse as far as 754.6 feet.  (Exhibit S: M67 test shot video).

### B.    Defendant's Intent To Purchase A Claymore Mine

During the July 8, 2016, conversation, the UCE mentioned in passing that his military contact had referenced the lax accountability of high explosive grenades and Claymore mines at the military range. The defendant responded by describing the Claymore mine as "a magical piece of equipment" and noting how it achieves "total destruction."

A Claymore mine is an anti-personnel mine that can be detonated remotely. It has imprinted on it, "FRONT TOWARD ENEMY," and contains a layer of C-4 explosive behind hundreds of steel balls that are projected outward in an arc at a high

---

[18] *Id.* at 15.

[19]  In exchange for his firearm, Gregerson received grenade bodies containing high explosives and grenade fuses.  For safety reasons, the FBI had dissembled the M67 grenades, removing the live fuses and placing them in a separate canister.  Together, Gregerson received the components for three high explosives grenades, which are destructive devices, as defined by 26 U.S.C. § 5845(f).

velocity upon detonation.  (Exhibit T).  The Claymore mine has a killing range of 109 yards and an injury-producing range of 273 yards in front of the mine.[20]

On July 15, 2016, Gregerson told the UCE that their conversation about the Claymore mine had "intrigued" him and that he wanted to buy a Claymore mine, in addition to the M67 fragmentation grenades.  Gregerson asked a number of questions relating to the purchase, and discussed the price of $250.00 for the Claymore mine.[21] On July 20, 2016, the UCE told Gregerson that obtaining the Claymore mine would take some time.  Gregerson's response was that he had the patience to wait.

### C.    The Defendant Planned On Purchasing Additional Military Weapons.

On July 5, 2016, the UCE asked Gregerson how many M67 grenades he wanted.  Gregerson replied: "I would say if that is an avenue of possibility, start with, let's say five, see where that can go, you know what I mean?"  Gregerson's purchase of five high explosives grenades was just the beginning.  It is also clear from the defendant's conversations with the UCE that he intended to make other purchases from the UCE's military "source."  In addition to the Claymore mine, the defendant asked the UCE on July 27, 2016, to arrange for the defendant to obtain flashbang grenades (i.e., stun grenades).  "Just to have a couple tucked away . . . That'll always be very useful."  During the same conversation, the defendant also

---

[20]  The Department of the Army Technical Manual for Land Mines, October 1995 ed., at 2-3.
[21]  Exhibit U:  July 15, 2016, Transcript, pp. 201-207

talked about the desirability of keeping the relationship going with the UCE's military contact: "Cause, like I say, we wanna keep the business relationship going and then if we can keep money flowing his way and we can get some nice stuff coming our way, everybody wins."

## IV.   The Defendant's Statements Showed He Was Arming Himself To Commit Violent Acts

The defendant's belief in an ongoing war against the enemies of ISIS, his belief that he is a soldier in that war, and his efforts to procure military weapons, all indicate that he was preparing himself for "combat."   His statements to the UCE confirm that he was arming himself in preparation to commit violent acts.

- On June 21, 2106, Gregerson told the UCE that the 40mm grenade launcher he initially wanted to buy was "made for combat."

- On the same date, Gregerson explained his reasons for purchasing smoke grenades:  "You know, smoke is always practical in terms of covering your retreat, but also in terms of causing chaos within your enemy's ranks, you know what I mean."

- On July 15, 2016, Gregerson discussed the arsenal of weapons he possessed and stated: "See, the best offense is overwhelming firefight . . ."

- During the July 27, 2016, conversation with the UCE, Gregerson discussed with the UCE his plans for a full tactical response to law enforcement if they came for him, including the use of high explosive grenades.

- During the same conversation, Gregerson referred to his desire to supplement his self-described "armory" with five more "battle rifles" and to arm like-minded ISIS "brothers" in Maryland, including the former Imam whose Facebook page expressed his avid support for ISIS.

In his July 27, 2016, conversation with the UCE, the defendant referred to his upcoming purchase of high explosive grenades – ". . . we're supposed to be better prepared than the infidels . . ." The defendant's statement indicates that his purpose in purchasing the grenades was to equip himself in preparation for a confrontation with "infidels."

On July 27, 2017, when the UCE told the defendant that obtaining the Claymore mine would take time, the defendant responded:

> The believer is patient. This is what separates the believer from the infidels. A believer has patience. A Muslim can outlast the enemies of Islam. All that a believer has to have in jihad in the cause of Allah is patience. They have to have patience to outlast the enemy.

A little later in the conversation, the defendant stated "Patience is what distinguishes the believer from the infidels. We will outlast them because they can keep fighting and fighting but eventually they will get tired. We will not." The defendant's statements reflect that his desired purchase of a Claymore mine was to equip himself as a "believer" conducting jihad in a perceived war against infidels.

## A.     The Defendant's Statements Relating To Committing Violent Acts Are Consistent With ISIS's Calls For Violence

During the same time period when the defendant was evidencing his alignment with ISIS and amassing weapons, he also made statements about committing violent acts consistent with ISIS's calls for violence.

### 1.     Violence against Muslim Leaders

On May 1, 2016, the defendant made statements to the UCE about committing violent acts against Muslim religious leaders who had entered a restaurant where Gregerson and the UCE were sitting.  The defendant spoke of using the knife he was carrying to kill them or executing them by committing the "Mozambique Drill," i.e., shooting someone twice in the torso and then once in the head.  Gregerson described the scenario as "like shooting fish in a barrel."

ISIS regularly exhorts its followers to murder religious clerics that do not subscribe to ISIS ideology.  The April, 2015, issue of *Dabiq* included an article entitled: "Kill the Imams of Kufr [disbelief] in the west," with a subtitle: "Murtaddin [apostates] in the West," which openly encouraged the murder of Muslim clerics.  In a July 27, 2016, conversation with the UCE, the defendant described moderate Mulims as "kufar" [nonbelievers, heretics] and "apostates."

### 2.     Violence against Law Enforcement

ISIS has repeatedly called on its followers to murder law enforcement officers.  For example, in an ISIS propaganda video reissued in January, 2015, ISIS's

22

second-in-command urged followers, " . . . do not let this battle pass you by wherever you may be . . . Strike their police, security and intelligence members, as well as their treacherous agents."

In his conversations with the UCE, the defendant made statements about committing violent acts against law enforcement. On June 21, 2016, the defendant and the UCE were at a park in Dearborn, Michigan. The defendant pointed to an individual in uniform in the vicinity, concluding that it was a park ranger. The defendant pointed out the tactical advantage of "two against one," referring to himself and the UCE versus the park ranger, and then proceeded to describe a way to ambush and attack the park ranger.

On June 21, 2016, the defendant told the UCE that he wanted to purchase a very large caliber revolver. The defendant noted: "That's one that would surprise the cops, too, that thing. 'Oh you're wearing a vest?' Bam! 'You've got plates on?' Bam! 'Kevlar helmet? I don't' think so!' Bam!"

On July 27, 2016, the defendant also talked to the UCE about how he would use the grenades if law enforcement came to his residence. Gregerson described how that scenario "warranted a full tactical response."

### 3.    Violence Against Homosexuals

ISIS is virulently anti-homosexual. ISIS adherents view homosexuals as deserving of death, and ISIS has killed homosexuals living in areas under its control

by hurling them from the top of buildings and by stoning them to death.  ISIS has released multiple videos depicting the execution of homosexuals.

The defendant's statements to the UCE mirror ISIS's loathing of homosexuals and the view that homosexuals deserve to be killed.  In a conversation with the UCE on June 12, 2016, the day after the mass shooting at Pulse, a popular gay nightclub in Orlando, Florida, that resulted in 49 deaths, the defendant approved of and praised the attack, stating, "Ramadan is the month of victory."  Gregerson lauded the attacker: "May Allah grant this brother jannah [paradise]" and "this brother saw an evil, and he did something."  Gregerson went on to say: "The brother owned an AR [assault rifle], and he owned a Glock, and he decided he was going to do something. The thing is, there's nothing they can do about someone like him – somebody that knows the truth and decides they want to do something, there's absolutely nothing you can do about this."

On the following day, June 13, 2016, the defendant purchased an assault rifle -- a collapsible Kel-Tec 2000 (9mm) rifle for $229.99.  Bank records indicate that, at the time, the defendant's bank balance was $331.11.  After the purchase, the defendant's bank balance was $101.12.  The Kel-Tec 2000 folds in half so that it can be placed in a carrying case which conceals that it is a long-barreled gun.  (Exhibits J.8, J.9: photos of Kel-Tec recovered from the defendant's residence).

One week later, on June 20, 2016, Gregerson posted a Facebook message condemning homosexuals and claiming that the Orlando attack was the just punishment of Allah for the "abomination" and the "indecency they practice." (Exhibit V).

The day following his Facebook posting, on June 21, 2016, the defendant again spoke about the Orlando night club attack with the UCE. The defendant used the term "brother" when referring to the attacker, who had stated his allegiance to ISIS.  Gregerson critiqued the Orlando attack, noting that the Orlando attacker had "picked a pretty good target," and then discussed how the attacker could have altered his actions to increase the death toll:

> It wasn't until the brother came out of one of the holes [that law enforcement had punched in the wall] and started engaging them that they finally took him down.  Because, honestly if he would have stayed in there with the hostages and just been taking pot shots from inside there, who knows, you know it could have been going on for 24 hours.[22]

Noting that hostages had been wounded in the incident and then bled to death, the defendant explained that if the attacker had just stayed in the bathroom longer, rather than emerging and confronting law enforcement, additional hostages would have met the same fate.  According to the defendant, using this tactic would also

---

[22] Exhibit W:  June 21, 2016 Transcript, pp. 18-20.

have meant that the attacker would have been in a position to kill law enforcement officers:

> The thing about that, if he would have just kind of stayed in there and held them off for a few more hours even, we would've been talking 75 [fatalities], you know, who knows. Then maybe he could have waited for the cops to come inside and try to pick off a couple of them on the inside, you know, because he would've had a little bit of an advantage.

Three days following this conversation, on June 24, 2016, the defendant deposited a check in the amount of $1,200.00 from the former Imam and ISIS supporter in Maryland. In the memo line was written, "zakat," referring to the Islamic obligation to give charity. The next day, on June 25, 2016, the defendant withdrew $500.00 from an ATM and bought a long gun rifle for $486.00.[23] He then incurred two overdraft fees because the check had not yet cleared.

On June 29, 2016, four days later and after the former Imam's $1,200.00 check for "charity" had cleared, the defendant withdrew $480.00 from his bank and purchased a Glock 32 (.357) handgun from an individual at a Michigan gas station. After the withdrawal to purchase the gun, the defendant's bank balance was $341.45.[24] As of the same date, the balance in his wife's bank account was $0.27.

---

[23] The defendant's average bi-weekly pay from Target at this time was $489.16.

[24] This was not the first time the defendant used money ostensibly provided as "charity" to pay for weapons. On June 24, 2015, the same Maryland ISIS supporter wrote a check to Gregerson for $1,300.00. In the memo line was written, "zakat." On June 29, 2015, Gregerson presented the check to his bank, receiving $500.00 in cash and depositing the remaining $800.00 in his checking account. This was the largest deposit made into Gregerson's account since the account was opened in November, 2014. Shortly after depositing the funds, Gregerson made several

As noted above, the defendant critiqued the Orlando terrorist attack with a view of how more fatalities could have been achieved. He critiqued other ISIS terrorist attacks with the same purpose. In a conversation with the UCE on July 20, 2016, the defendant stressed to the UCE the importance of planning and not rushing into committing an attack in order to "have more of an impact," that is, cause more deaths. Gregerson went on to praise the ISIS attacker who, on July 14, 2016, drove a truck into crowds celebrating Bastille Day in Nice, France, killing 86 people. Gregerson noted that it "was quite, un, quite an operation because the glass was bulletproof," which shielded the driver "even if they did open fire on the truck." The defendant praised the attacker for some of his planning, "he did a little homework, you know. Apparently scouted out the location a few times."

On July 21, 2016, the defendant criticized terrorist attackers who did not plan or train well enough before acting. He pointed to the Garland, Texas attackers at the Mohammad cartoon contest where both shooters were killed before inflicting casualties. Gregerson referred to them as "overzealous brothers" who, while they had "body armor and ARs," "they didn't know anything about it."

---

electronic payments to his Chase credit card, which at the time had a balance approximately six times the average monthly balance on the credit card up to that time. The larger balance was due to Gregerson's purchases of weapons and weapons-related items, including the purchase of several tactical knives in the prior month.

**V.    Factual Summary Relating To The Defendant's Straw Purchase
       of a Firearm**

On May 2, 2017, the defendant entered a guilty plea in case number 17-cr-20235 for making a straw purchase of a Glock firearm in Virginia. From 2011 to 2014, the defendant lived in Maryland. During that time, the defendant became friends with an individual who lived in Virginia (hereinafter "CW"). As emails between the defendant and the CW show, the defendant often solicited the CW to buy firearms and magazines for the defendant in circumvention of firearms laws. (Exhibit X.1 through X.9).

Typically, the defendant would email the CW a link to a seller who was using the armslist.com website to sell a gun that was of interest to the defendant. The defendant would instruct the CW to contact the seller and would then provide the CW with cash for the firearm. For instance, on October 30, 2013, the defendant sent an email to the CW with a link to armslist.com relating to the sale of a semi-automatic pistol, the Springfield Armory Extreme Duty (XD) Series, .357-4. The defendant wrote, "I get paid on the 7th which is next thurs so I can have the money then." (Exhibit X.1). In an email a week later, November 8, 2013, the defendant told the CW that if the person selling the .357 XD had not replied to the CW's email inquiring about purchasing the firearm, "I was wondering if you could send an email to another seller with a similar pistol." The defendant included another link to

armslist.com – this time for a glock-32-gen-4-357-sig.  Gregerson wrote: "I have the

cash on hand so that is not an issue, he seems to want to sell quick.  If you get a reply

I could wire you the money or meet you out that way . . ."  (Exhibit X.2).

Email evidence, interviews of witnesses, including gun sellers and the CW,

bank, ATF and other records show that:

- The defendant gave the CW cash to purchase a Kel-Tec semi-automatic rifle on December 15, 2013.  Three years later, the defendant gave the UCE the option to buy this gun because the defendant had purchased the newer version.

- The defendant made purchases of weapons-related materials, including several AK-47 magazines, and either purchased them in the name of his friend or had the products shipped to him in Virginia.

- On April 21, 2013, the defendant instructed the CW to purchase a Beretta M9 pistol for him at a gun show.  The defendant gave the CW cash which he had withdrawn from ATMs to make the purchase.  The Beretta that the defendant purchased through the CW was the same firearm he used in exchange for the high explosive grenades he bought through the UCE on July 31, 2016.

The facts underlying the defendant's guilty plea in case number 17-cr-20235

are as follows:  Bank records show that, between February 14 and 16, 2014, the

defendant withdrew a total of $1,600.00 in cash from ATM machines in Baltimore,

Maryland.  On February 16, 2014, the defendant accompanied the CW to a gun show

in Virginia.  The defendant identified a Glock .357 pistol as the gun he wanted the

CW to purchase for him and gave the CW cash to make the purchase.    The CW

signed an ATF Form 4473 indicating that he was the buyer of the firearm when, in fact, the actual buyer of the firearm was the defendant. The defendant was present during the purchase and took immediate possession of the gun after the purchase. Over two years later, in July, 2016, the Glock .357 caliber pistol was recovered from the defendant's residence at the time of his arrest and was still registered in the CW's name.

### A.   Gregerson Breaks With His Friend Over ISIS

Gregerson moved back to Michigan in approximately September, 2014. On August 30, 2015, the defendant emailed the CW a link relating to an ISIS video, indicating that the video was "well worth viewing," that ISIS was "working toward noble goals" and that "the only group telling the truth is the state [i.e. the Islamic State or ISIS]. (Exhibit Y). That same day, the CW responded by email, stating that he could not "get behind a group that does some good but mixes it with things that are clearly not OK. Ending the lives of tourists on a beach is not OK . . .," an apparent reference to an attack claimed by ISIS where a gunman killed 38 people at a Tunisian beach resort on June 26, 2015. According to Facebook records, Gregerson removed the CW from the defendant's "friends" list on the day following this email exchange with the CW, apparently because the CW objected to ISIS's violent tactics. Since then, the defendant has had no further communications with the CW.

The CW told law enforcement that, about the time the defendant moved to Michigan in September, 2014, he was espousing such extremist support for ISIS that the CW considered reporting him to the FBI but was dissuaded from doing so by others.

## ARGUMENT

## I.    The Presentence Report and Sentencing Guideline Calculations

### A.    The Government's Objections To The Presentence Report

#### 1.    Objection No. 1 (Page 15, ¶¶ 56 and 57)

The government initially objected to awarding a reduction of responsibility based on its understanding that the defendant had made false statements to the probation officer during his presentence interview relating to the offenses.  The Probation Department has since clarified, and issued an addendum to the PSR, that the defendant's false statement relating to the straw purchases of firearms -- that he was only holding the guns for his friend because his friend's wife would not allow guns in their home -- was made before the defendant's guilty plea and acknowledgement of guilt.  The Probation Department has also clarified the nature of other statements that were the basis of the government's initial objections.  In light of the addendum and clarifications, the government no longer maintains its objection to awarding the defendant acceptance of responsibility.[25]

---

[25] During his pre-sentence interview, the defendant denied that was an ISIS supporter.  Although there is abundant evidence that the defendant is an ISIS supporter, the government does not

2.     Objection No. 3  (Page 23, ¶ 109) and No. 4 (Page 23, ¶ 112)[26]

In its discussion of the sentencing factors, the PSR asserts that a sentence within the guideline range would sufficiently protect the public.  (PSR, p. 23, ¶ 109). The government disagrees, for the reasons discussed below.

In its discussion of § 3553(a)(6), which requires the Court to avoid unwarranted sentencing disparities among comparable defendants, the PSR states that defendants similarly situated to the defendant who have been sentenced by the U.S. District Court for the Eastern District of Michigan have received sentences within the 37 to 46 month sentencing guideline range.  (PSR, p. 23, ¶ 112). Sentencing disparities are gauged among defendants nationwide, not just those sentenced in the Eastern District of Michigan.   The "objective is to eliminate unwarranted disparities nationwide."  *United States v. LaSalle*, 948 F.2d 215, 218 (6th Cir. 1991); *see also, United States v. Thompson*, 218 Fed.App'x 413 (6th Cir. 2007).  As is discussed more fully below, courts both in this district and elsewhere have routinely varied above the sentencing guideline range and sentenced comparable defendants to sentences of 60 months or higher.

---

contest the Probation Department's conclusion that acceptance of responsibility should not be denied on that basis.

[26]  The government withdraws its Objection No. 2, page 21, ¶ 106, which was in the nature of a correction, clarifying that the FBI's concern was not just that Gregerson had evidenced his support of ISIS but that he had, at the same time, accumulated a vast amount of weapons, ammunition and tactical gear, while also making statements about committing violent acts and approving of ISIS terrorist attacks.

## II.     Sentences of 60 Months And 12 Months Are Necessary
##          In Light of the Section 3553(a) Factors.

Sentences of sixty months in the grenade case and twelve months in the firearms case are necessary to reflect the seriousness of the offenses, to protect the public from further crimes of the defendant, and to adequately deter similar conduct.[27]  § 3553(a)(2)(A)-(C).  The fact that the defendant is an ISIS adherent who approves of ISIS terrorist attacks and views them as legitimate, who considers himself a soldier and the United States, the enemy, who armed himself to the teeth, made statements about desiring to commit violent acts, and assessed other terrorist attacks with a view to increasing fatalities are all facts which justify a significant sentence.

In determining the defendant's sentence, the Court can and should consider the defendant's alignment with and support of ISIS.  A district court exercises "wide discretion" in its consideration of information at sentencing and should base a sentence on "the fullest information possible concerning the defendant's life and characteristics." *Williams v. New York*, 337 U.S. 241, 247 (1949).  The law expressly provides that there is "[n]o limitation" on "the information concerning the

---

[27]  The government agreed in the Rule 11 in case number 17-cr-20235 not to oppose a defense request for a sentence concurrent to the sentence imposed in case number 16-cr-20552.

background, character, and conduct" of a defendant that may be considered at sentencing. 18 U.S.C. § 3661.

There is no First Amendment constraint in considering the defendant's ISIS support, as the defendant has claimed in the past. *Wisconsin v. Mitchell*, 508 U.S. 476, 487-89 (1993) (no First Amendment prohibition in the "evidentiary use of speech to establish the elements of a crime or to prove motive or intent."); *see also, United States v. Abu-Rayyan*, Case No. 16-cr-20098, 2017 WL 1279226, at *10 (E.D.Mich. April 6, 2017) (rejecting First Amendment challenge to consideration of defendant's viewing and dissemination of ISIS propaganda " . . . as it informs the court's consideration of what Abu-Rayyan may have intended when he purchased and attempted to purchase a firearm . . ."). As in the *Abu-Rayyan* case, when Gregerson's ISIS support is "combined with conduct suggesting an intention to carry out jihadist activities, the court is well within its realm when it considers those background facts to inform the court's determination of the defendant's motives and intents." *Id.*

## A.    A Substantial Sentence Is Necessary To Protect the Public

ISIS, "an organization whose brutality is shocking even by the standards of terrorism,"[28] has inspired numerous individuals to commit terrorist acts resulting in mass casualties in the United States and elsewhere. It is the defendant's alignment

---

[28] *United States v. Ahmed,* 107 F.Supp.3d 1002, 1005 (D.Minn. 2015).

with ISIS that amplifies his dangerousness, in particular his dangerousness in purchasing the high explosive grenades.   His allegiance to ISIS and his view of himself as a soldier in an ongoing war against enemies of ISIS illuminate his intent and purpose in arming himself with high explosive grenades and other weapons. The threat to public safety is greater even than ordinarily involved in the offense of possession of illegal grenades and a more substantial sentence is therefore warranted.

The defendant's support for ISIS is evidenced by his Facebook profile depicting ISIS soldiers going into battle, his Facebook postings approving of ISIS terrorist attacks, his emails indicating support for ISIS advances and attacks, his consumption of ISIS propaganda, ISIS suicide and other videos, his dissemination of ISIS propaganda, and his use of "we" when referring to ISIS.  As is apparent from his emails, Facebook postings and statements to the UCE, Gregerson believes what ISIS believes – that terrorist attacks are legitimate and that the murder of civilians is laudable.  Similar evidence establishes that Gregerson hates who ISIS hates and has expressed his view, like ISIS's, that moderate Muslim clerics, law enforcement and homosexuals deserve a violent death.  *Dawson v. Delaware*, 503 U.S. 159, 166 (1992) ("A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future.")

The evidence also establishes that Gregerson, like ISIS, believes the world is at war. He has said so on Facebook, in emails, and to the UCE. The defendant views himself as a soldier and a prisoner of war who is incarcerated by an enemy of ISIS. In the view of Gregerson and ISIS, the U.S. is an enemy in this war, as are civilians enjoying a soccer game or restaurant meal in Paris, young adults having a night out in a club in Orlando, and families celebrating a holiday on a seaside promenade in Nice. In the war of ISIS and Gregerson, terrorist attacks on civilians are not only permissible, but commendable. In Facebook postings and in conversations with the UCE, Gregerson praised the terrorist attacks in Paris, Orlando, and Nice. In the defendant's view, the murder of U.S. and foreign military personnel by ISIS is also appropriate because such acts take place in the context of a war. Most people could not bring themselves to watch a video recording of ISIS burning the Jordanian pilot alive. Gregerson not only watched the video, he advanced theological arguments to others to support ISIS's murder of the pilot.

The defendant's alignment with ISIS and his approval of ISIS terrorist attacks illuminates what the defendant intended when he purchased military grenades and amassed an armory of other weapons. The defendant followed the directive of ISIS in accumulating weapons in preparation for a violent confrontation with enemies of ISIS. In 2015, the defendant purchased multiple weapons, hundreds of rounds of AK 47 ammunition, fifteen knives, including several fixed-blade, tactical knives,

tactical gear and tactical training materials. There is a clear demarcation in 2015 when his purchases escalated and changed in nature that coincided with his alignment with ISIS.

The defendant then purchased high explosive grenades through the UCE -- military weapons which are indiscriminate, capable of producing mass casualties, and whose sole purpose is to cause death and injury. The defendant also had on hand components to construct additional grenades, intended to assemble those components into deadly devices, and had a launcher on hand to lob them. He had also surreptitiously acquired firearms by using a straw purchaser and used one of those firearms to purchase the illegal grenades.

In addition, the defendant wanted to buy a Claymore anti-personnel mine -- another military weapon which inflicts death and injury indiscriminately and is capable of causing mass casualties. The defendant's purchase of high explosive grenades from the UCE and his desire to obtain a Claymore mine, showed, as Magistrate Judge Majzoub noted, "a willingness to act on his interest in purchasing and possessing weapons with increasingly higher destructive capabilities."[29]

But for his arrest, the defendant would not have stopped illegally purchasing military weapons. The defendant told the UCE that his initial purchase of five

---

[29] Doc. #13: Detention Order Pending Trial, PgID 91.

grenades was just a beginning. Gregerson also told the UCE that he wanted to have the supply line to military weapons open into the future. He had "patience" to wait on his purchase of the Claymore mine. The defendant also spoke of his desire to increase his "armory" with additional "battle rifles," to procure smoke grenades to facilitate retreat from the "enemy," and to obtain flashbangs.

The defendant has argued to the Court in the past that he accumulated weapons because he was a gun enthusiast, military weapons buff, and hunter. According to records maintained by both Michigan and Maryland, the defendant has never held a hunting license. While the defendant may hold an interest in weapons generally, the escalation of his weapons purchases in 2015 and 2016, and the changing nature of his purchases, coupled with his ISIS support refute any benign explanation for his purchase of military weapons. Five high explosives grenades are not a hobbyist's or collector's item. Nor is a Claymore mine. In 2015 and 2016, the defendant purchased other items which further dispel any recreational motive --- commercial grade road spikes, a balaclava mask, military vests with pouches designed to contain illegal grenades, and tactical fixed-blade knives. In 2015 to the time of his arrest, the defendant was working part-time at Target stocking shelves, making $9.50 an hour, on average $489.16 bi-weekly. The large and increasing percentage of the defendant's small salary that he expended on weapons and weapons-related accessories during this same time period is not indicative of a side

38

hobby, particularly for a man with a wife and two small children. In some instances, a single gun purchase represented the totality of his bi-weekly paycheck.

The defendant has indicated his desire to commit violent acts consistent with ISIS's calls for violent attacks. Shortly before his arrest, he praised the Orlando attack in glowing terms, issued his own rant approving the murder of homosexuals, and then purchased three guns in a two-week period, virtually emptying his bank account in the process. Those gun purchases appear particularly menacing when juxtaposed with Gregerson's disturbing statements.

The defendant also assessed, critiqued and evaluated other terrorist attacks. The defendant assessed how the Orlando attack could have been better executed to increase both civilian and law enforcement fatalities. Such an assessment reveals how Gregerson thinks he could have done it better and portends consideration of his own attack.

Gregerson stressed the importance of planning and not rushing into committing an attack in order to "have more of an impact." While the defendant was arrested before he could take action, and there was no evidence of a specific plot underway, the defendant described himself as "a long-term planner" who criticized other terrorists for failing to plan. He had assembled the weaponry and had the means to carry out the violent acts he expressed a desire to commit. His release

anytime in the near future would present a clear danger to the public and the threat that he will follow through on his stated desire to engage in a violent act.

**B.    Substantial Sentences Are Necessary To Deter Others From Similar Conduct**

The sentence imposed must "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).   A substantial sentence is warranted to deter other ISIS supporters from arming themselves with military weapons, illegally compiling components for destructive devices, or violating firearms laws to clandestinely amass firearms.

It is critical to deter other ISIS supporters who are considering but have not yet executed ISIS's command to prepare to commit violent attacks at home.  Lone wolf attacks are extremely difficult for law enforcement to prevent.  Testimony of James Comey, May 3, 2017, before the Senate Judiciary Committee ("The central challenge is not just finding needles in a nationwide haystack but trying to figure out which pieces of hay might become a needle.  And that is, which of the troubled . . . people are consuming poisonous propaganda – some ISIS, some Anwar al-Awlaki, some other sources – and are moving towards thinking an act of violence like a stabbing at a shopping mall is some way to achieve meaning in their lives.")[30]

---

[30]  https://www.judiciary.senate.gov/imo/media/doc/05-03-17%20Comey%20Testimony.pdf

The former FBI Assistant Director of the Counterterrorism Division, Michael B. Steinbach, stated to a Congressional subcommittee on February 26, 2015: "We are concerned about the possibility of homegrown extremists becoming radicalized by information available on the Internet . . . Individuals inspired by foreign terrorist groups could quietly arm themselves with the expertise and tools to carry out an attack. Community and world events may trigger one of these individuals to take action."[31]

A sentence that achieves specific deterrence, on the other hand, is unlikely. The defendant does not even acknowledge the unmistakable fact that he is an ISIS supporter -- the very issue that magnifies the dangerousness of his conduct. Further, the defendant views himself as soldier for ISIS.  Like any soldier, he is unlikely to relinquish this view of his identity by virtue of being in prison.  In fact, he considers himself a prisoner of war.  Once released, he is likely to resume his activities for "jihad in the cause of Allah."  Even if specific deterrence is an unachievable sentencing objective in this case, a sixty-month sentence is justified as a means to incapacitate the defendant.  " . . . [E]ven terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of

---

[31]  *ISIL in America: Domestic Terror and Radicalization: Hearing Before the Subcomm. On Crime, Terrorism, Homeland Security and Investigations of the H.Comm. on the Judiciary*, 114th Cong. 27 (2015).

rehabilitation, and the need for incapacitation." *United States v. Stewart*, 590 F.3d 93, 143 (2d Cir. 2009) (citation omitted).

### C.      The History and Characteristics of the Defendant

There is nothing in the defendant's history or characteristics that mitigate the threat he poses to the public.  The most salient characteristic of the defendant for purposes of sentencing is his identification with and support of ISIS.  The defendant disassociated himself from those who did not share his ISIS extremist ideology – kicking out wife's family during a visit and unfriending the CW from Facebook for this reason.  The defendant's emails and Facebook page show that he associated only with a small group of like-minded ISIS supporters, most in Maryland, and dropped contact with those who were not.

The defendant spent an increasing proportion of his small salary on weapons and weapon-related accessories in answer to ISIS's call to amass weaponry, rather than on necessities for his wife and two young children.  Funds he received ostensibly for charity were not devoted to family expenses, but spent on weapons, at a time when the defendant's bank account was nearly empty.  Those spending choices evidence the depth of the defendant's commitment to arming himself and to ISIS's call to do so.

### D.    Courts Have Imposed Substantial Sentences Above Sixty Months in Comparable Cases

A sentence of sixty months on the grenade offense is also necessary to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  Defendants similarly situated to Gregerson have routinely received sentences of 60 months and higher. Courts have regularly varied upward in such cases, recognizing that defendants charged with weapons-related offenses presented an added danger because of their ISIS support and that a greater sentence was warranted to protect the public and to provide for deterrence.

For instance, in the recent case of *United States v. Abu-Rayyan*, Case No. 16-CR-20098, 2017 WL 1279226 (E.D.Mich. April 6, 2017), Judge Steeh sentenced the defendant to 60 months when the guideline range was 15 to 21 months.  In that case, the defendant was charged with possession of a firearm while being a habitual marijuana user and false statements to acquire a firearm, in violation of 18 U.S.C. §§ 922(a)(6) and (g)(3).  The defendant was described as less "scary" than Gregerson by defense counsel for Abu-Rayyan, and, therefore, deserving of a sentence of less than the 60-month cap contemplated in the Rule 11 for the grenade case here.  Abu-Rayyan had posted ISIS videos and comments in support of actions depicted in the videos, expressed support for ISIS and a desire to commit a martyrdom operation by shooting up a church and killing a police officer.  The Court found that the

43

defendant's support for ISIS and his statements about committing violent acts justified a significant upward variance to reflect the seriousness of the offense, to protect the public and to deter others. *Id.*

Most recently, in *United States v. Wehelie,* Case No. 1:16-cr-162 (E.D.Va. July 14, 2017), the court sentenced the defendant, an ISIS supporter who is a known associate of Gregerson, to 120 months, an upward departure from the applicable sentencing guideline range of 33 to 41 months. Wehelie pleaded guilty to being a felon in possession of firearms based on his transportation of guns over state lines for money. The court varied upward to 120 months – the statutory maximum -- based on the danger the defendant posed to the public in light of his professed support for ISIS and his statements to a UCE that he wanted to travel to join ISIS, or, if unsuccessful in traveling, that he wanted to conduct an attack on a U.S. military recruiting station.[32]

Other courts have imposed above guideline range sentences to address the danger posed to the public because the defendant's offense conduct was coupled with ISIS support and a stated desire to harm others. *See, e.g., United States v. Franey*, CR16-5073, (W.D. Wash. 2017), Doc.#51: Transcript of Sentencing Hearing, at 64 (defendant convicted of unlawful possession of machine gun, whose

---

[32] https://www.washingtonpost.com/local/public-safety/he-talked-about-committing-a-terrorist-attack-hell-go-to-prison-for-10-years/2017/07/14/dc312e82-67dc-11e7-9928-22d00a47778f_story.html?utm_term=.5552e26ecf5b.

guideline range was 33 to 41 months, sentenced to 72 months based on his support for ISIS and statements indicating his desire to kill police officers and military personnel); *United States v. Diaz*, 1:15-cr-JAL, Doc. #34: Transcript of Sentencing Hearing, at 24 (S.D. Fld.  July 27, 2015) (defendant convicted of being a felon in possession of a firearm, whose guideline range was 33 to 41 months, sentenced to 120 months where defendant was an ISIS supporter, had a number of firearms and ammunition in his possession, and had made statements about killing people), sentence aff'd in *United States v. Diaz*, 652 Fed.App'x 839 (11th Cir. 2016) (unpublished opinion);  *United States v. Shah*, No. H-06-428, 2012 WL 1098387 at *1 (S.D. Tex. March 29, 2012) (defendant convicted of being an nonimmigrant alien in possession of a firearm, whose guideline range was 15 to 21 months, sentenced to 78 months; defendant admitted to law enforcement that he had been participating in "combat training in preparation for jihad against the United States").

## CONCLUSION

For all of these reasons, the government submits that a sentence of sixty months in case number 16-cr-20552 and twelve months in case number 17-cr-20235 is sufficient, but not greater than necessary to achieve the objectives of 18 U.S.C.

§ 3553(a).  The government also requests that the Court impose the conditions of supervised release set forth in the Rule 11, ¶ 3B, in case number 16-cr-20552.

Respectfully submitted,

DANIEL L. LEMISCH
ACTTING UNITED STATES ATTORNEY

*s/Cathleen M. Corken*
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9100
E-Mail: Cathleen.corken@usdoj.gov

Dated:  August 21, 2017

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 21, 2017, I filed or caused to be filed the

foregoing document on the ECF system, which will send notice to counsel of record.

<div style="margin-left: 40%;">

<u>s/Cathleen M. Corken</u>
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9100
E-Mail: Cathleen.corken@usdoj.gov

</div>