UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**UNITED STATES OF AMERICA,**

          Plaintiff,

    v.

**SEBASTIAN GREGERSON A/K/A
ABDURRAHMAN BIN MIKAAYL,**

         Defendant.
_____/

**HONORABLE ARTHUR J. TARNOW**

**No. 16–20552 and 17–20235**


**SENTENCING HEARING**


**Wednesday, August 30, 2017**


Appearances:

FOR THE PLAINTIFF:         CATHLEEN CORKEN, ESQ.
FOR THE DEFENDANT:       DAVID THOLEN, ESQ.

–   –   –

*To obtain a certified transcript, contact:*
*Lawrence R. Przybysz, MA, CSR, RPR, RMR, CRR*
*Official Federal Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 124*
*Detroit, Michigan  48226*
*(313)414–4460.  Lawrence_Przybysz@mied.uscourts.gov*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

*Sentencing Hearing*
*Wednesday, August 30, 2017*

**I  N  D  E  X**

–   –   –

SENTENCING HEARING..............................P. 3

*16-20552 and 17-20235; United States of America v. Sebastian*
*Gregerson a/k/a Abdurrahman Bin Mikaayl*

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 3

1                              Detroit, Michigan

2                              Wednesday, August 30, 2017

3                              3:00 p.m.

4                          -   -   -

5          **THE COURT CLERK:**  Calling case number 17-20235, and

6    case number 16-20552, United States of America versus Sebastian

7    Gregerson.  Will counsel please identify themselves for the

8    record?

9          **MS. CORKEN:**  Good afternoon, your Honor Cathleen

10   Corken on behalf of the United States.

11         **MR. THOLEN:**  Good afternoon, your Honor. May it

12   please the Court, David Tholen on behalf of Mr. Gregerson, your

13   Honor.

14         **THE COURT:**  Good afternoon, all.

15         **MR. THOLEN:**  Good afternoon, Judge.

16         **THE COURT:**  Bring your client to the lecturn, please.

17   You remember you are still under oath.

18         **THE DEFENDANT:**  Yes.

19         **THE COURT:**  And you still have a Fifth Amendment

20   right to remain silent.  Do you understand that?

21         **THE DEFENDANT:**  Yes.

22         **THE COURT:**  And you are in jail now.  In the last 12

23   hours, have you had any -- let me go back a step.  And you

24   choose to answer my questions?

25         **THE DEFENDANT:**  Yes.

Page 4

1      **THE COURT:**  Okay.  In the last 12 hours have you had

2  any alcohol, prescription drugs, or other drugs that would make

3  it hard for you to understand what is happening now?

4      **THE DEFENDANT:**  No.

5      **THE COURT:**  Do you understand?

6      **THE DEFENDANT:**  Yes.

7      **THE COURT:**  What is the procedure today?

8      **THE DEFENDANT:**  It's a sentencing Hearing.

9      **THE COURT:**  Okay.  And let me explain how this is

10  going to work in terms of presentation.  Ultimately, you have

11  the final word.  You have the right of allocution, it's called,

12  and you can choose to say whatever you want related to the

13  possible sentence.  But before we get to that point I'm going

14  to talk to your lawyers, to your lawyer, and to the Government

15  lawyer about the Presentence Report.  Now, have you read the

16  Presentence Report?

17      **THE DEFENDANT:**  Yes.

18      **THE COURT:**  Have you gone through it with your

19  attorney?

20      **THE DEFENDANT:**  Yes, several times.

21      **THE COURT:**  Are you satisfied with your attorney?

22      **THE DEFENDANT:**  Yes.

23      **THE COURT:**  Okay.  And I note there was some

24  objections and that is one of the things I will talk to your

25  attorney about.  But do you have any questions about what is

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 5

 1    going to happen today other than what the ultimate sentence is?

 2                **THE DEFENDANT:**  No.

 3                **THE COURT:**  Okay.  So I am going to talk, as I said,

 4    to the attorneys first about the Presentence Report to make

 5    sure that we are in agreement as to what the calculations are

 6    and should be.  And then I will ask the Government for their

 7    recommendation as to the appropriate sentence.  And I note that

 8    the Government has already filed a Sentencing Memorandum

 9    indicating what their recommendation is, but I want to put that

10    on the record, not quite in so much detail.  And then I will

11    ask your attorney for his recommendation.  And I note the same

12    thing, that he has already filed in both cases.  You realize

13    there are two case here?

14                **THE DEFENDANT:**  Yes.

15                **THE COURT:**  And both have filed in both cases

16    memoranda as to what your sentence should be.  And after I am

17    done listening to them it will be your turn and you will have

18    your right of allocution.

19         Anything else, Mr. Tholen, before I get to the sentence --

20    the Presentence Report?

21                **MR. THOLEN:**  I filed objections that relate to

22    arguments or information the Government intends to rely on in

23    its argument so I can address it now or we could address it at

24    that point.  It doesn't relate to the Presentence Report.

25                **THE COURT:**  Okay.  We can discuss it before the

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 6

1  Government gives their recommendation but after the Government

2  talks about the Presentence Report.  The Presentence Report

3  computes a Category One, Level 21.  Are the people in agreement

4  with that?

5          **MR. THOLEN:**  We are, your Honor.

6          **THE COURT:**  Government?

7          **MS. CORKEN:**  Yes, your Honor.

8          **THE COURT:**  I didn't hear you.

9          **MS. CORKEN:**  Yes, your Honor.

10          **THE COURT:**  Okay.  And that according to the

11  sentencing guideline manual presents a guideline range, an

12  advisory guideline range of 37 to 46 months, is that correct?

13          **MR. THOLEN:**  That's correct, your Honor.

14          **MS. CORKEN:**  That's correct, your Honor.

15          **THE COURT:**  Okay.  And that range applies to both

16  cases, correct?

17          **MR. THOLEN:**  Incorrect, Judge.

18          **THE COURT:**  What does it apply to?

19          **MR. THOLEN:**  It applies to the destructive device

20  Counts.

21          **THE COURT:**  Yes.  Okay.

22          **MR. THOLEN:**  In the other case the guidelines are

23  lower.  I believe they are six months to 12 months for the

24  straw purchase of the firearm, the case that was removed here.

25          **THE COURT:**  I'm corrected.  Thank you.  That was out

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 7

1    of Virginia.

2              **MR. THOLEN:**  Yes.

3              **THE COURT:**  Okay.  Do you agree with that?

4              **MS. CORKEN:**  Your Honor, yes, that is how the parties

5    calculated the guidelines with respect to the Virginia case.

6              **THE COURT:**  Okay.  And one of you  refresh my

7    recollection as to what the Rule 11 range was?

8              **MR. THOLEN:**  The Rule 11 range, your Honor, for the

9    destructive device case was a guideline range of 37 to 46

10   months.  However, there was a provision that the Government

11   reserved the right to argue for an upward departure or variance

12   up to 60 months.  Also under the agreement, defense could not

13   argue for a sentence below 37 months.

14        With respect to the straw purchase, the firearm case, the

15   guidelines were 6 to 12 months and the Government agreed to not

16   object or contest to a concurrent sentence in that case to

17   whatever the Court would impose in the destructive device case.

18             **THE COURT:**  Is that your recollection, counsel?

19             **MS. CORKEN:**  Yes, your Honor.

20             **THE COURT:**  Okay.  So now we are all on the same

21   page.  Now would be appropriate to talk about your objections,

22   Mr. Tholen.

23             **MR. THOLEN:**  Yes, your Honor.  The objections are not

24   to any of the calculations in the Presentence Report.  They

25   are -- they relate to solely to what I believe are fuller

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 8

1   discussions of the recordings between Mr. Gregerson and the

2   undercover FBI employee.  And I guess I want to make it clear.

3   I think the context and completeness is important and so my

4   objection -- or it may have been formed as a correction when I

5   filed these with the Probation Department originally -- was

6   that I was not objecting to the statement that Probation had in

7   the various paragraphs of the Presentence Report, but that I

8   thought that the additional information I was adding should be

9   added to that to have a complete picture.  Probation responded

10  not that I was incorrect, but that they felt that the report is

11  written effectively, complied with the information that the

12  Government had provided it and so it was not inclined to add my

13  information, if you will, or the defendant's objection

14  information to the various paragraphs.

15          **THE COURT:**  Okay.  Now, the Government also has

16  objections or are these responses to the defendant's

17  objections?

18          **MS. CORKEN:**  Yes, your Honor.  Your Honor, with

19  response to the defendant's corrections or objections, the

20  defendant has submitted a Presentence Report Addendum to the

21  Court.  I believe the defense submitted that under seal.  And,

22  in effect, it just repeats what the Probation Department has

23  already included in their addendum to the Presentence Report.

24          **THE COURT:**  So you have no objection to it being

25  added as an Addendum?

Page 9

1          **MS. CORKEN:**  I think it's redundant.  If we want to

2     be redundant, that's fine.  It's already there.  And would you

3     like me to address our own objections, your Honor?

4          **THE COURT:**  Well, does that satisfy you, Mr. Tholen,

5     and your client?

6          **MR. THOLEN:**  Your Honor, if I had my way I think that

7     the paragraphs would be modified to include both parts of the

8     information.  I do wholeheartedly agree that this information

9     is part of the Addendum.  And just for the Court's edification,

10    it was filed under seal because, of course, the Addendum to the

11    Presentence Report is not a public document which is not on the

12    docket.  And so for me to advance this position before your

13    Honor it had to be filed under seal because this information

14    the Government had as part of sensitive discovery.  But I do

15    agree it is word for word the same information that is in the

16    Addendum to the Presentence Report right now.

17          **THE COURT:**  Okay.  Now will you answer my question?

18          **MR. THOLEN:**  Which was, am I satisfied with that?

19          **THE COURT:**  Yes.  Not if you are satisfied -- well,

20    yes if you are satisfied in terms of your position being known

21    and if it was completely redundant did you want it there or

22    not?  Your choice.

23          **MR. THOLEN:**  I certainly want it to stay in the

24    Addendum.  The Court certainly has the ability to require

25    rewriting of the report or make a finding that the Addendum is

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 10

1  appropriate.  And I don't want to put words in the Court's

2  mouth, but if the Court is suggesting that because it's in the

3  Addendum it's already in the record, I certainly understand

4  that ruling.

5          **THE COURT:**  Well, you got it.  That is the ruling.

6          **MR. THOLEN:**  I understand that, Judge.

7          **THE COURT:**  All right.

8          **MR. THOLEN:**  And I have no other objections to the

9  Presentence Report.  I don't know if the Government does or

10  not.

11          **THE COURT:**  Now, the Government has some corrections?

12          **MS. CORKEN:**  Yes, your Honor.  With respect to the

13  Government's suggested corrections, we are not pressing on

14  those that the Probation Department decided not to adopt.  We

15  did have some objections.  There were a few that we did

16  withdraw, one, in particular, after the Probation Department

17  submitted its latest Addendum making it clear that the

18  defendant's false statement with respect to the straw purchase

19  was made before he entered his guilty plea.  So we have two

20  objections that are outstanding.

21          **THE COURT:**  Tell me the numbers, please.

22          **MS. CORKEN:**  Sure.  It's Government's objection

23  number three which is to page 23 of the report.  Paragraph --

24          **THE COURT:**  Hang on, please.

25          **MS. CORKEN:**  Sure.  Paragraph 109, your Honor.

Page 11

1     **THE COURT:**  Let's do objection number three.

2     **MS. CORKEN:**  Okay.  So, your Honor, the report

3 provides that the sentence within the guideline range would

4 protect the public from further crimes of the defendant.  And

5 it's certainly the case at least with respect to the grenade

6 matter that the Government's view is that a sentencing

7 guideline -- a sentence within the guidelines would not protect

8 the public.  In all honesty, I am a little bit -- I have a

9 question with respect to how this is phrased in the Presentence

10 Report because the Presentence Report covers two cases.  And

11 the sentence is a sentence within the sentence guideline range

12 that would protect the public.  If the Probation Department

13 means that a sentence within the guideline range for each of

14 the cases in the aggregate or consecutively would protect the

15 public then that is something that the Government would agree

16 with.  But with respect to -- if they are just talking about --

17     **THE COURT:**  Isn't part of your Rule 11 Agreement to

18 agree they be concurrent?

19     **MS. CORKEN:**  I do, your Honor.

20     **THE COURT:**  Okay.

21     **MS. CORKEN:**  I do.  I don't believe that what I am

22 saying is contrary to what we have agreed to.  I think the

23 question is, does the Government object to a sentence that

24 indicates that a sentence within the guideline range, if

25 Probation Department is just talking about the grenade case,

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 12

1  that that would protect public, that that is not, obviously,

2  our position.  It's just not clear from the report whether

3  since the report does address two cases --

4          **THE COURT:**  What is the defense response?

5          **MR. THOLEN:**  The defense response is this sounds like

6  the Government's argument for an upward variance which -- I

7  understand the Government doesn't like the way the Presentence

8  Report came out and they are still entitled to make their

9  objections and ask this Court to impose a sentence within or

10  above the guideline range.  But this doesn't --

11          **THE COURT:**  To what extent?

12          **MR. THOLEN:**  Pardon, Judge?

13          **THE COURT:**  The Rule Eleven, as I understand it, puts

14  a limit as to what they can ask for an upward variance. And

15  that is how many months?

16          **MR. THOLEN:**  14 months up to 60 months.

17          **THE COURT:**  Go on.

18          **MR. THOLEN:**  One, I disagree with the Government's

19  reading on that paragraph on page 22, at least the paragraph

20  after it, 110, the Probation Department identifies two separate

21  ranges for both cases.  And then the Probation Department

22  indicates that is a sentence within the guideline range would

23  be appropriate to effectively achieve the goals of sentence.

24  We accept that statement by the Probation Department.  I

25  understand the Government does not accept that statement.  But

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 13

1    that is not a factual issue.  I think that is a legal ruling

2    for the Court to make.

3              **THE COURT:**  All right.  The Government's objection is

4    noted and I'm not going to change anything.  What is your next

5    objection, please?

6              **MS. CORKEN:**  Your Honor, we had one final objection

7    and that was to paragraph -- page 23, paragraph 112 which

8    provides -- which is discussing the factor under 3553(a)(6) of

9    a sentence that needs to avoid unwarranted sentencing

10   disparities among defendants with similar records who have been

11   found guilty of similar conduct.  And then the Presentence

12   Report notes that throughout this court, sentences for

13   defendants with similar records that were found guilty of

14   similar conduct have generally fallen --

15             **THE COURT:**  Please slow down and use the microphone

16   in front of you.

17             **MS. CORKEN:**  Yes, your Honor.  I apologize.  Your

18   Honor, the Presentence Report indicates that defendants who

19   have been sentenced within this court who are comparable to

20   this defendant have been sentenced within the same sentencing

21   guideline range.  And, first of all, we would -- our objection

22   is that in considering this factor as a legal matter, the Court

23   is to consider not only comparable cases of defendant's

24   sentence within this court but also those who have been

25   sentenced nationwide.

*16-20552 and 17-20235; United States of America v. Sebastian*
*Gregerson a/k/a Abdurrahman Bin Mikaayl*

Page 14

1          **THE COURT:**  I understand.  Mr. Tholen, your response?

2          **MR. THOLEN:**  My response is the same.  To me we

3    accept the statement by the Probation Department in the report

4    at that paragraph and I think the Government is again advancing

5    its argument for an upward departure.  I don't see why the

6    report would need to be changed.

7          **THE COURT:**  Well, I have had the same question the

8    Government has raised in many cases.  It's very rarely raised

9    but it's been the practice of the Eastern District of Michigan

10   to talk in terms of disparity if there are co-defendants.  I

11   take a broader view and I do consider others similarly

12   situated, even nationwide.  But, and that is on the record now.

13   And note that the guidelines are advisory so that statement is

14   not necessarily how I'm going to come out on disparity.  But I

15   should note here that in the Rule 11, the Government has taken

16   a position, first of all, what charge to bring and so on which

17   is limited to a ten year felony.  But more relevant is that the

18   Rule 11 stipulates that you are not going to ask for more than

19   five years.  And what I hear is that you are wanting perhaps --

20   and maybe I am anticipating something you are not going to

21   do -- that you are, by changing this language, would allow you

22   to ask for more than five years.

23          **MS. CORKEN:**  No, your Honor.  I have no intention of

24   asking for more than five years.

25          **THE COURT:**  Wait a minute.  I don't understand what

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 15

1   you just said.  You have no objection --

2        **MS. CORKEN:**  I'm sorry.  I have no intention of

3   asking for more than 60 months.

4        **THE COURT:**  Okay.  That's fine.  And then this

5   language will stay in the report because that's what we do in

6   the Eastern District of Michigan.  But I also do what you are

7   asking me to do and that is consider a broader pool.  Okay.

8       Anything else to resolve in the Presentence Report before

9   we go into recommendations?

10       **MR. THOLEN:**  Nothing for the defense, Judge.

11       **MS. CORKEN:**  Nothing from the Government, your Honor.

12       **THE COURT:**  The Government goes first in terms of

13  what is your bottom line?

14       **MR. THOLEN:**  Your Honor, I indicated and I appreciate

15  that I indicated I had some objections to exhibits they may

16  refer to.  Would this be an appropriate time to deal with that?

17       **THE COURT:**  Sure.

18       **MR. THOLEN:**  Can we do it at side bar, Judge?

19       **THE COURT:**  No.  Is your objection to -- contained in

20  your letter of today?

21       **MR. THOLEN:**  Yes, Judge.

22       **THE COURT:**  Okay.  Hang on.

23       **MR. THOLEN:**  Three issues.  That's all I am objecting

24  to.

25       **THE COURT:**  Pardon?

*16-20552 and 17-20235; United States of America v. Sebastian*
*Gregerson a/k/a Abdurrahman Bin Mikaayl*

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 16

1        **MR. THOLEN:**  It's those three items.  That is what I

2   am objecting to, your Honor.

3        **THE COURT:**  Okay.  I picked up the packet of letters

4   in support of your client.

5        **MR. THOLEN:**  I'm not objecting to those, Judge.

6        **THE COURT:**  I understand that.  But now I have to

7   find -- I have it here, too.  I'm sorry.  All right.  First of

8   all, is the Government planning on using any of these three?

9        **MS. CORKEN:**  No, your Honor.

10       **THE COURT:**  Without mentioning what they are?

11       **MS. CORKEN:**  We submitted them under seal, your

12   Honor.

13       **THE COURT:**  Does that answer your objection?

14       **MR. THOLEN:**  It does.  Just so I'm clear, the

15   Government is not going to argue any of those three things

16   today?

17       **MS. CORKEN:**  No.

18        **THE COURT:**  You want to give her a chance to change

19   her mind?

20       **MR. THOLEN:**  I asked twice, Judge, just to be safe.

21   Then it's resolved, your Honor.

22       **THE COURT:**  All right.  Okay.  Now, the Government's

23   bottom line and why?

24       **MS. CORKEN:**  Your Honor, the Government is requesting

25   a sentence of 60 months.

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 17

1          **THE COURT:**  Why don't you adjust at least the

2     microphone so you're using it.

3          **MS. CORKEN:**  Sure.

4          **THE COURT:**  And the whole podium goes up if you need

5     it higher.

6          **MS. CORKEN:**  I think I'm okay.

7          **THE COURT:**  All right.

8          **MS. CORKEN:**  Your Honor, a 60 month sentence in the

9     Government's view is a sentence that is sufficient but not

10    greater than necessary to protect public, to reflect the

11    seriousness of the offense and deter others from similar

12    conduct.

13         Your Honor, this is a defendant who is an ISIS supporter,

14    who purchased high explosive grenades, who had an arsenal of

15    other weapons, who, like ISIS, believes that there is a war

16    between ISIS and those are not ISIS, who believes he's a

17    soldier in that war and who, as ISIS directs, equipped himself

18    with weapons in preparation for violent actions and who made

19    statements about harming others with weapons.  Those are

20    aggravating factors that are not taken into account in the

21    calculation of the sentencing guideline range that is

22    applicable here.

23         The sentence guidelines only look to the defendant's 's

24    conduct in possessing the grenades.  They don't look to these

25    factors that magnify his dangerousness and the need to protect

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 18

1   the public.  That range doesn't take into account the

2   seriousness of the offense when possession of grenades are

3   coupled with his ISIS support.  So it's not just a case about

4   someone who has purchased high explosive grenade.  That's

5   dangerous enough. Grenades are military weapons.  There is no

6   other purpose for them but to injury and cause death.  That is

7   their function.

8        But high explosive grenades are even more dangerous in the

9   hands of an ISIS supporter who approves the terrorist attacks

10  and makes statements about harming others.

11       Your Honor, the defendant denies that he's an ISIS

12  supporter in the face of overwhelming evidence.  He denied it

13  to the Probation Department that he even read or disseminated

14  Dabiq.  In his Sentencing Memo he admits that he read Dabiq but

15  he claims it was purely for an academic interest.  And that is

16  completely contradicted by the evidence.

17       The defendant certainly downloaded every issue of Dabiq

18  that was published up to the time his arrest.  But he also

19  disseminated that publication to other ISIS supporters via

20  e-mail.  He also e-mailed links about ISIS terrorist attacks

21  and with a clear indication of his approval of those attacks.

22  He had in the subject line, Allahu Akbar, God is Great.  He had

23  a smiley face in the subject line of an e-mail where he was

24  providing a link to an article about the ISIS terrorist attack

25  on the Sinai Peninsula where police officers were killed.  On

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 19

1  Facebook, in emails, to the UC, he praised terrorists' attacks

2  committed by ISIS and those inspired by ISIS, the Paris

3  attacks, the Nice attack, the Orlando attack.  He referred to

4  terrorists who commit attacks in the name of ISIS as brothers.

5  He defended ISIS violence.  He sent an e-mail to others

6  defending the ISIS's murder of the Jordanian Air Force Pilot.

7  They had been criticized for it.  And he sent an e-mail

8  providing a theological justification for that murder.

9      He also, as he stated to the UCE, is an avowed follower of

10  Anwar Al Awlaki.  He has 96 CDs of Anwar Al Awalki's lectures.

11  And Anwar Al Awlaki, as the Court may know, was a big recruiter

12  providing inspiration to many individuals who have committed

13  terrorist attacks that have resulted in mass casualties. The

14  defendant used the collective, we, when referring to ISIS and

15  his Facebook profile, which is something people use to project

16  their identity, had a photograph of ISIS soldiers.

17      So this is not just some academic interest on the part of

18  the defendant.  His alignment with this terrorist group is

19  clear.  It's also clear he believes there is an ongoing war

20  between ISIS and those who are not ISIS adherents.  I'm not

21  going to repeat everything that was in the Government's

22  Sentencing Memo but it's clear he approves of terrorist attacks

23  committed by ISIS and he thinks those are legitimate because

24  the world is at war.  And he views himself as a soldier in that

25  war as is clear from his reference to himself as the prisoner

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 20

1   of war.

2        Your Honor, ISIS call on their followers to stockpile

3   weapons, to equip themselves with weapons.  The defendant sent

4   an e-mail with a translation of the second in command's speech

5   calling on ISIS soldiers to do just that, to prepare themselves

6   and to mobilize for Jihad.  And that is what the defendant did.

7        Particularly, your Honor, in 2009 he amassed an arsenal of

8   weapons and ammunition, tactical gear, tactical training

9   materials.  He owned guns before that, yes, and he appeared to

10  have a prepper or survivalist type of interest.  But that

11  certainly was not his exclusive interest, and as of 2015 it's

12  also clear he was equipping himself with weapons in preparation

13  for violent action.

14       Something clearly changed in 2015.  That is clear from his

15  actions.  That's clear from his statements.  That is clear his

16  purchasing history.  There was an escalation in the number and

17  the changing nature of the weapons that he purchased.

18       Your Honor, the Sentencing Memo already discussed the

19  defendant's -- the change in the defendant's purchase of

20  knives, that he purchased fifteen in 2015.  He also purchased

21  two training knives.  The defendant claims that these were not

22  knives that were marked for tactical use, that basically he was

23  just purchasing collectors knives.  But it's clear from the

24  names of the knives themselves that they are tactical knives,

25  that they are combat knives.  He purchased, for instance, the

Page 21

1    the Ontario Knife Marine Combat Knife.  Most of the names of

2    the knives do have the word combat or tactical on them.  And

3    almost every one that the defendant purchased was specifically

4    marketed as a tactical knife and how they were advertised and

5    that is what we have included as Exhibit K.

6        So these are not collectors knives.  And you certainly

7    don't get training knives that are the rubber counterparts of

8    fixed blade knives if your interest is simply in collecting.

9        Your Honor, the amount of money that the defendant spent

10   on knives during this time period as a percentage of his income

11   undermines any claim that this is just a hobby or that he's

12   some collector of knives.  There is a true seriousness of

13   purchase that is reflected in his purchasing actions during

14   this time period.  I had handed to Mike Government's Exhibit

15   Number One.  I was wondering the Court had that.

16           **THE COURT:**  The purchasing from June 2015, yes.

17       **MS. CORKEN:**  Yes, your Honor.  Your Honor, I have, of

18   course, provided it to the defense.

19           **MR. THOLEN:**  We have it, Judge.

20       **THE COURT:**  Thank you.

21       **MS. CORKEN:**  Your Honor, that Government's Exhibit

22   shows the knives that were purchased from June 14, 2015 to

23   July 12, 2015 by the defendant.  That is a 28 day period.  He

24   purchased five tactical knives during that period.  And his

25   payroll during that period was, as indicated on the exhibits,

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 22

1   $1,170.

2        **THE COURT:**  You used the word payroll.  I think you

3   mean income.

4        **MS. CORKEN:**  I do, your Honor.  Income.  Excuse me.

5   His income during that time period was as I just indicated and

6   you also see what his bank balance was.  So when you look at

7   this exhibit, you see that first he spent more than half of his

8   income on these five knives at a time when his bank balance was

9   modest and those spending -- these spending decisions, excuse

10  me, undermine any claim that this -- these purchase of tactical

11  knives was some kind of hobby or of collector's interest.

12       There are also additional purchases showing the nature of

13  his purchases during this time period were tactical in nature.

14  He purchased tactical belts, body armor with military grade

15  plates, balaclava ski mask, commerical grade road spikes.  He

16  also amassed an enormous amount of weapons and weapon related

17  material.  And just focusing on, for instance, AK47 related

18  materials, and just during this time period, in March of 2015

19  the defendant purchased 700 rounds of K47 ammunition.  A month

20  later he bought an underground ammunition storage container.

21  That same month, in May of 2015 he bought a Kushnakov (ph)

22  training video.  Same month he bought Dummy AK47 training

23  rounds.  And in the search of the residence, law enforcement

24  recovered almost 3,000 rounds of AK47 ammunition.  A total of

25  almost 8,000 rounds of ammunition were recovered from his

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 23

1    residence.  This -- the information about his purchases

2    relating to AK47 materials all during the time period where the

3    defendant was evidencing support for ISIS and their terrorist

4    attacks.

5         Your Honor, the Sentencing Memo has also laid out the

6    defendant's increase or acceleration of firearms purchases

7    within a two week period in 2016 where he bought three

8    firearms, two of which were long barreled.  And the memo also

9    sets out what is a clear indication of the defendant's

10   priorities.  He received a check for 1,200-dollars as charity

11   and spent the bulk of that on guns, not on necessities for his

12   family.

13        The defendant in his Sentencing Memo makes some reference

14   to -- makes a claim that the firearms were all purchased

15   legally.  That is not the case at all.  The defendant used a

16   third party to circumvent gun laws.

17            **MR. THOLEN:**  Judge, that's not the claim, just to

18   correct it. I specifically said the straw purchase firearm was

19   the exception.  The Government is misstating my filed document

20   with the Court.

21            **THE COURT:**  You may continue.

22            **MS. CORKEN:**  Thank you, your Honor.  Your Honor --

23            **THE COURT:**  Your objection is noted.

24            **MR. THOLEN:**  Thank you, Judge.

25            **MS. CORKEN:**  Your Honor, my point was simply that the

Page 24

1    defendant violated the law on three occasions, federal law on

2    three occasions in making straw purchases of a Kel-Tec sub 2000

3    assault rifle, a Beretta.  The Beretta he used to purchase the

4    grenades and a Glock.  And, in addition to violating federal

5    law, he did not register the Beretta or the Glock when he had

6    them.  When he moved to Michigan he didn't register either of

7    those guns with Michigan.

8        He also had components in a grenade launcher, your Honor,

9    to make homemade illegal grenades.  In two conversations he

10   relayed in detail about how to make illegal fragmentation

11   grenades from those components.  And he was -- he explained the

12   benefits of having all the parts necessary to modify 37 rounds

13   but not assembling them to prevent being caught.

14       Your Honor, in addition to the components and everything

15   else he had, he obviously engaged in the purchase of high

16   explosive grenades which, of course, can inflict mass

17   casualties and are inherently dangerous.  That was just a

18   start.  He planned on purchasing a claymore mine which has a

19   killing rate of 1,000 yards.  And he also told the UCE he

20   wanted flash bang or stun grenades and he wanted the connection

21   for military weapons to be kept open in the future.  It's clear

22   he wasn't buying grenades or that he had any interest in the

23   other weapons for a hobby.

24       Your Honor, most importantly, there is a connection

25   between the weapons he acquired and using the weapons in a

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 25

1   violent act.  He told UC how he would commit an act on a

2   building using 37-millimeter grenades.  Quote, if I locked into

3   a building, I'm talking about interior use, by the time you get

4   through then you walk over there.  When you get inside

5   everybody is all disoriented.  I really think that would be

6   devastating.  He's talk about committing an attack on people

7   within a building and using 37 millimeter grenades which he had

8   or smoke grenades which he bought to make sure people inside

9   the building were disoriented by the time he got inside.  He

10  had two conversations with the UC where he's detailing how to

11  make these homemade fragmentation grenades.  What does he say

12  about that?  He specifies that illegal -- these illegal

13  homemade rounds could be used indoors to clear places to hit a

14  gathering.  He's talking about using illegal homemade grenades

15  of the type he described making to the UC indoors hitting a

16  gathering of people.  He expressed an interest in obtaining

17  particular type of 40 millimeter grenade launcher that would be

18  mounted on a rifle that was made for combat.  He talked about

19  purchasing smoke grenades to cause chaos within your enemies

20  ranks, that is, using enemies against people.  And he talked

21  about using homemade -- or excuse me -- high explosive grenades

22  against law enforcement.

23      Your Honor, there is also a connection between the weapons

24  and using those weapons against the enemies of ISIS.  The

25  defendant states about high explosive grenades.  He was

1  expressing his belief that he was equipping himself with

2  grenades to be better prepared against those he believes to be

3  at war with and in preparation for confrontation with infidels.

4  He also expressed his desire to supplement his self-described

5  armory with more battle rifles and arm like-minded ISIS

6  brothers in Maryland.

7      Your Honor, with respect to the claymore mine, he called

8  it a magical piece of equipment and that it achieves total

9  destruction.  That was what was appealing to the defendant

10  about the claymore mine -- its destructive capabilities.  That

11  is what he focused on.  He indicated that he had the patience

12  to wait for it in terms of purchasing it and that all that a

13  believer has to have in the Jihad in the cause of Allah is

14  patience.  Patient is what distinguishes the believer from the

15  infidel.  We will outlast them because we can keep fighting and

16  fighting but eventually they will get tired.  We will not.  I

17  think it's clear from his statements he wanted to purchase the

18  claymore mine as a weapon in Jihad to take violent action in

19  this perceived war against the infidels.

20      The defendant also made statements of intent to harm

21  Muslim clerics who do not subscribe to ISIS indicating when

22  they were deserving of death. he talked about using the knives

23  he was carrying to execute them or a firearm to shoot them

24  using this Mozambique drill technique.  He talked about using

25  high explosive grenades against laws enforcement.  ISIS has

1   called on that repeatedly in terms of attacks against law

2   enforcement.  He talked about how he and the UC could attack

3   and kill a park ranger.  And he certainly made it clear that he

4   thought all homosexuals were deserving of death.  He praised

5   the ISIS attacker in Florida.  He called him a brother.  He was

6   deserving of paradise.

7         Your Honor, his accumulation of weapons, his purchase of

8   the high explosive grenades were all connected with the ISIS

9   extremism and its believe in this war between ISIS and others

10  and his own preparations to commit a violent act.

11        What is most chilling and what underscores of the

12  defendant's dangerousness I think is his critique of ISIS

13  terrorist attacks, how attackers could have increased civilian

14  and law enforcement fatalities.  That is beyond creepy. It is

15  chilling.  He talked about the Orlando attack and how the

16  attacker could have increased deaths in that case.  He

17  emphasized the importance of planning.  He praised the attacker

18  in the Nice attack for using a truck with bulletproof glass.

19  He was critical of the Garland, Texas attack because the

20  attackers were killed there before they could kill.  This is

21  not someone who has an academic interest.  This is not someone

22  who is a prepper.  This is not someone who has an academic

23  interest in ISIS.

24        A 60 month sentence is necessary to protect the public.

25  The law enforcement has an enormous challenge in preventing

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 28

1   individuals have been radicalized and subscribe to the ISIS

2   ideology. They can become operational.  The defendant argues

3   that he didn't harm anyone.  It is true, obviously, that the

4   Government arrested the defendant before any specific plot or

5   before a terrorist attack was committed.  But it's also clear

6   he's an ISIS supporter who illegally obtained lethal

7   fragmentation grenades and he wanted more.

8          If you sentence the defendant to the low end the range, 37

9   months, he is out in eighteen months.  And it's the

10  government's view that he cannot be released --

11          **THE COURT:**  How is he out in 18 months?

12          **MS. CORKEN:**  Calculating good time, your Honor, the

13  time that he already served and the time in a halfway house.

14          **THE COURT:**  Well, he's certainly served that time in

15  custody awaiting trial or awaiting the plea and the sentence.

16  That doesn't mean he's only serving 18 months.  He's serving

17  eighteen months plus what he has already served.

18          **MS. CORKEN:**  Your Honor --

19          **THE COURT:**  And I understand the good time does

20  reduce the 37 months somewhat.

21          **MS. CORKEN:**  Yes, your Honor.  My point I guess would

22  be that the defendant is dangerous and that he can't be

23  released in the near future without posing a risk to the

24  public.

25          **THE COURT:**  Okay.  I understand your point.

Page 29

1          **MS. CORKEN:**  Okay.  Your Honor, I think it is

2    significant that the defendant does not even admit that he's an

3    ISIS supporter.  When he walks out of prison, will he be

4    anything other than a committed ISIS adherent?  He considers

5    himself a POW.  Like any professional soldier he is unlikely to

6    relinquish that view of himself as a soldier while he's in

7    prison.  He hasn't changed since his arrest.  He hasn't

8    concluded that he's on the wrong path.  If he hasn't concluded

9    he's on the wrong path, he's not likely to change his behavior.

10   He's not on the road to doing something different once he's

11   released from prison.

12         Your Honor, we already discussed in our Sentencing

13   Memorandum the history and characteristics of the defendant and

14   how in the government's view they do not argue for anything

15   less than a 60 month sentence, particularly given the

16   defendant's -- the nature of the defendant's associates and his

17   friends.

18         Your Honor, the defense does argue that the defendant has

19   no criminal record.  But I would suggest that there is greater

20   proclivity to break the law than his lack of record reflects.

21   And I would point to the number of times that he engaged in

22   straw purchases, his failure to register handguns and but for

23   his arrest, he would have continued to buy illegal military

24   weapons.

25         Your Honor, with respect to the factor of providing or

Page 30

1   fashioning a sentence to afford adequate deterrence, the

2   Government submits the 60 months is necessary to achieve that

3   purpose as well.  Deterrence is critical because of the serious

4   nature of the threat posed by ISIS supporters who abide by

5   ISIS' directive to prepare or begin to prepare for Jihad.  It's

6   important to sent the public a message that even the first

7   steps to prepare to exhibit a violent act carries serious

8   consequences.

9       And then, lastly, your Honor, we have cited in our

10  Sentencing Memorandum a number of cases where other courts have

11  recognized that the combination of a defendant being an ISIS

12  supporter and indicating an intent to do harm is —— justifies a

13  significant upward variance.  The Government in this case is

14  asking for fourteen months.

15      Now, the defendant argues, well, these other cases aren't

16  comparable because the defendants there made specific threats

17  of violence against a specific target.  That is not the case

18  with respect to the Shaw case that we cited.  There was no

19  specific plan.  There was no specific targets.  The other

20  defendants also were not on the eve of committing any attack.

21  This defendant is no less dangerous than they are.  Just

22  because he did not commit a specific act of terrorism doesn't

23  mean he's not dangerous.  All of the other defendants like this

24  defendant were charged with firearms or other offenses.  They

25  were not charged with committing a terrorist act. They weren't

1    charged with committing an attempted terrorist act or

2    conspiracy.  What the courts recognized was that ISIS support

3    plus evidence of intent to do harm causes -- is a danger to the

4    public and it requires a very substantial sentence.

5         Here we have evidence of the defendant's intent to do

6    harm.  He has stated it in different -- with respect to

7    different attacks, different -- on different occasions, in

8    different -- with Facebook, e-mails and with the UCE.

9         Your Honor, in conclusion, we would ask for a 60 month

10   sentence because of all these factors, primarily because he's

11   an ISIS supporter who bought high explosive grenades, amassed

12   an enormous amount of guns and ammunition as ISIS directs and

13   made statements reflecting a desire to commit violence acts. We

14   would also ask that you impose a supervised release condition

15   pursuant to Rule 11 (c)(1)(c) that are set out in paragraph

16   3(b) of the Rule Eleven.  And with respect to forfeiture, your

17   Honor, there is an agreement that certain items will be

18   administratively forfeited and therefore no forfeiture orders

19   are needed and no forfeiture language needs to be included in

20   the judgment.  Thank you, your Honor.

21             **THE COURT:**  Defense?

22         **MR. THOLEN:**  Thank you, Judge.  Your Honor, my

23   request on behalf of Mr. Gregerson with respect to the straw

24   purchase firearm case would be a sentence at the bottom of the

25   guidelines of six months imprisonment and have that sentence

Page 32

1   run concurrent to the other case.  With respect to the

2   destructive device case, I'm asking the Court to impose a

3   sentence of 37 months imprisonment and I will explain the

4   reasons why.

5        The Government had a lot to say today and has had a lot to

6   say in the pleadings that it filed before today.  From my

7   assessment, the Government has overstated its case from the

8   first court proceedings I represented Mr. Gregerson in which

9   were during his detention hearings.  I made the claim then and

10  it's surprising that when I line up the pleadings that the

11  Government filed at that time and the allegations they had,

12  and, of course, they had the benefit because they had

13  investigated Mr. Gregerson for 16 months.  This was all before

14  they filed a complaint against him.  So they had that

15  information.  There is very much of an overlap and very little

16  new information that they are presenting now at the time of

17  sentencing.

18       I said it before and I will say it again, the Government

19  is overstating its case.  And the Government from my

20  perspective had a preconceived theory of this case and it

21  involved all this talk about ISIS and whether or not

22  Mr. Gregerson is aligned with ISIS and then the Government, and

23  I mean the Prosecutor in this case, has cherry picked facts,

24  whether they are taken out of context, whether they are

25  misleading to the Court, and plucked them in to support its

Page 33

1    theory.  And it's not -- it's going about this all backwards.

2        In this case the first thing I will argue against will be

3    the Government's request for an upward departure of 14 months.

4    I would object to any upward departure in this case.  And I

5    know the Court has the authority -- first, the Government has

6    the authority to argue for it under the Rule Eleven.  I agree

7    with that, and the Court certainly has a discretion if it

8    believes there is aggravating factors to go above the guideline

9    range.  I wholly agree with that.  In this case, quite simply,

10   the Government has neither the facts nor the law on its side.

11   The Government cited four or five specific cases that it

12   attempted to bolster its position to support or make an

13   argument to your Honor that a 60 month sentence was warranted.

14   However, they didn't want to talk about any of the facts of

15   that case, Judge. I did, Judge. Each of those cases had

16   something very specific and something very scary, a specific

17   threat against an individual or a specific location that is

18   wholly absent in this case.  And I disagree with the

19   government's assessment that in the Shaw case there wasn't a

20   plan because actually in the Shaw case, if you read the full

21   transcript, the Court points to the buildings, local buildings

22   from Houston were found on Mr. Shaw's computer and they had

23   concerns that he was targeting those buildings.  They were

24   aerial type photographs.  So I suggest in addition to all of

25   the other things that Mr. Shaw was doing, there was evidence of

Page 34

1    a plot there.  It is lacking in this case.

2         I represented Mr. Gregerson for thirteen months now and in

3    that time someone close to Mr. Gregerson shared with me that

4    Sebastian talks a lot of crap.  And you know what, Judge?  I

5    agree with that statement.  I also think the undercover FBI

6    employee in this case talked a lot of crap in the discussions

7    he had with Mr. Gregerson when they were building their case or

8    trying to do their investigation and bring this case to court.

9         The Government seems to be taking -- I mean this is the

10   United States.  We have a First Amendment right.  Individuals

11   are allowed to read controversial texts or magazine articles if

12   they want to.  The Government knows that Sebastian Gregerson

13   was taking a Homeland Security class at Henry Ford Community

14   College.  And they know this, one, because they had an

15   undercover employee following him around at those classes, but,

16   two, they went and interviewed his instructor at least three

17   times and they asked for his class work and asked how was he

18   doing in the course and what does he act like in class?

19        So for the Government to suggest why would Mr. Gregerson

20   read any articles about the Middle East or about anything going

21   on with terrorist attacks belies their own investigation.  He

22   was in a class on Homeland Security.  I mean, he was in that

23   class because he did have an interest in that.  But the

24   government has verified through its own investigation.  But

25   once again, that doesn't fit with their fact pattern, that

Page 35

1    doesn't fit with their conclusion so they say Mr. Gregerson

2    allies himself with ISIS.  That is not true.  Mr. Gregerson and

3    every one in the United States is entitled to unpopular speech,

4    is entitled to politically incorrect speech, and ultimately

5    that is what the Government has.  It you did a count on the

6    number of times they put ISIS in their 47 page Sentencing

7    Memorandum it would probably be at least hundreds of times.

8    What they didn't have was facts.  You might have noticed they

9    weren't citing cases.  They weren't citing reports.  They

10   weren't citing interviews most of the time.  And that's very

11   dangerous in this case, Judge.  In fact, one of the things the

12   Government wanted to introduce was certain articles that

13   Mr. Gregerson sent to other individuals.  And I explained in my

14   Sentencing Memorandum that as part of his interest

15   Mr. Gregerson did access through the Long War Journal which is

16   the United States political blog, if you will, articles about

17   the Middle East and terrorist activities there.  That is where

18   he was getting them from.  He wasn't on some ISIS website or

19   something as the government tries to portray. It's just not

20   true.

21        So, your Honor, with respect to whether or not the

22   Government has established the facts or the law for an upward

23   variance I don't think they have, Judge.  I know that the Judge

24   -- your Honor is going to be concerned with -- I'm asking the

25   Court to stay within the sentencing range, so what would be the

Page 36

1   appropriate sentence within the range?  The Government, again,

2   the things they focused on as far as danger, there are

3   misstatements.  The Government stood here and said today just

4   this afternoon that Mr. Gregerson had 37-millimeter grenades.

5   Untrue.  Patently untrue.  What he did have was 37-millimeter

6   flares.  What the Government knows through its own

7   investigation through the FBI explosives agent that analyzed

8   the flares, they were completely untampered with.  So they

9   never became grenades.  The Government stands here and tells

10  your Honor Gregerson had 37-millimeter grenades at his house.

11  No, he did not.  False statement.  The Government also has

12  continued to talk about in this case a Claymore mine.  You know

13  what?  We never saw a Claymore mine.  Every report has had the

14  Government's Exhibit of, quote, a Claymore mine that they got

15  out of some book or off Google or something like that. But you

16  know what?  There was never a Claymore mine that was negotiated

17  for, that was bought and sold, that was found in

18  Mr. Gregerson's house.  It didn't happen.  But you wouldn't

19  know that and the Government never backs down from that.

20       The Government has said that Mr. Gregerson has expressed,

21  if you will, my words, dangerous thoughts.  The most -- the

22  closest thing I can find to that in the four months of

23  recordings between Mr. Gregerson and the undercover FBI

24  employee -- and mind you, these recordings lasted from anywhere

25  from a half hour to seven or eight hours.  I mean, they were

Page 37

1    all over the map.  They spent a lot of time together.  And

2    Mr. Gregerson did make some comments that are close to what the

3    Government paraphrased and they were along the lines of his

4    prepper beliefs, which were that if all hell broke loose and he

5    was under attack or his family was under attack, he would bring

6    all the power he could against that force.  Now that is

7    something very different to me, your Honor.  To me that is a

8    defensive type statement or a defensive type posture.  And the

9    Government has continued to use those statements and insert law

10   enforcement or insert citizens or say, just like ISIS preaches,

11   but those things were not part of the statement and the

12   Government knows it.

13        I have asked the Court to consider a sentence at the

14   bottom of the range but I do so also because in the guideline

15   calculations, the calculations that reach the 37 to 46 months,

16   there is an enhancement, a specific offense enhancement due to

17   the number of firearms.  And in this case explosives equal

18   firearms for purposes of the guidelines.  So what has gone into

19   that calculation of 8 to 24 firearms are these 37-millimeter

20   flares that were found at Mr. Gregerson's residence.  There is

21   ten of them.  They upped -- without those being included, it

22   would be a plus two level.  The guideline range for the

23   destructive device would be 30 to 37 months.  They have been

24   included pursuant to the Rule 11 Agreement.  I am not shying

25   away from that.  But I point out to the Court that effectively

Page 38

1    through the terms of the agreement it's been elevated to

2    capture those 37-millimeter flares.  And what I think is

3    critical about the 37-millimeter flares, and the Court doesn't

4    have to take my word for this, the FBI analyzed these and the

5    flares -- and the Government keeps saying buckshot.  The

6    buckshot was in shotgun shells.  So the 37 millimeter flares

7    were in tact and they were, in fact -- the shipping box they

8    came was from Specialty Arms.  That is all in the FBI's

9    explosives reports.  The shotgun shells were in tact as well.

10   These things were not tampered with and the Government's own

11   experts looked at that.

12       What I think is critical, Judge, is the Government's

13   theory has been, well, Mr. Gregerson could have manipulated the

14   buckshot, could have manipulated the flares and created what

15   would be an unregistered explosive device.  I get it. It wasn't

16   done in this case.  And the plus four levels he gets in his

17   guidelines which make his guideline range 37 to 46 months, it's

18   the same now with pristine condition flares and shotgun shells

19   or the devious situation that the Government keeps saying was

20   going to happen if Mr. Gregerson had taken those things apart,

21   resembled them and created 37-millimeter grenades which didn't

22   happen.  The guidelines would treat those the same.  What I

23   suggest to the Court is even if the Court gives a sentence

24   which appears to be at the bottom of the range of 37 months,

25   it's taking into consideration this enhancement that the

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 39

1   guidelines factored into with respect to the 37 millimeter

2   flares.  I thinks it's relevant, judge.

3       Your Honor, throughout this case the Government has --

4   really has had tunnel vision about this from my perspective and

5   not looked at any other possible explanation for things.  And I

6   have tried to pinpoint a few of them for your Honor.  One is

7   that Mr. Gregerson is and has been a prepper for at least the

8   last ten years.  And a prepper, a doomsday prepper, whatever

9   you want to call it.  It's not my cup of tea, Judge, but there

10  are folks like Mr. Gregerson that are preparing for calamity,

11  catastrophe, power grids going down and he is going to have

12  food, water, and weapons to protect himself and his family from

13  the ravaging people that come after his stuff.  Okay?  He is

14  allowed to do that.  The Government hasn't looked at that.  The

15  Government knows when they did the search warrant at his

16  residence after he was arrested that they pulled out of their

17  in addition to all the exhibits it shows, your Honor, with the

18  guns and the ammunition and the knives, all of which were legal

19  with the exception of the firearm that was from Virginia in the

20  straw purchase case.  They also found a bunch of camping

21  equipment.  One of the pictures is a hatchet.  There was tents.

22  There was backpacks.  There was water.  There was food stores.

23  They didn't seize that because, of course, there is nothing

24  illegal about that, but it was all there.  But the Government

25  didn't want to talk about that.

Page 40

1    Mr. Gregerson also is proudly a Muslim and he has been so,

2  again, over the last ten years, perhaps more, actually more,

3  and he converted shortly after high school and he lives his

4  life in that way.  And your Honor can see he has a long beard

5  but his long beard is one of the things he does as part of the

6  his religion, to identify himself to others as Muslim.  He is

7  that.

8    The fact that he has made unpopular statements about

9  certain segments of society, that happens to be in line with

10  his belief and his faith.  It's politically incorrect.  It's

11  not the way I think.  But he's entitled to think that.  He's

12  entitled to say it.  He has not acted out on any of those

13  things.  Again, something else the Government ignores.  And on

14  that note, the Government submitted -- it's not referencing it

15  but it submitted a portion of the recording between the

16  undercover FBI employee and Mr. Gregerson talking about the

17  Orlando attack which as the Court knows involved what was known

18  to be a gay nightclub and there was a horrible tragedy there

19  and a number of innocent victims were shot up.  And the

20  Government presents this for the Court's consideration, has

21  highlighted, of course, only the portions that Mr. Gregerson

22  talks about.  But I am going to draw the Court's attention to

23  statements that were made unprovoked by the FBI undercover

24  agent which I find chilling and shocking.  One was the

25  undercover agent saying he would have smoked every last

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 41

1   hostage. And by smoked I assume he means killed them.  That is

2   coming from the undercover.  Another is, they're going to be

3   tripping on bodies.  That is a nice image coming, again, from

4   the undercover.  And perhaps what to me seems to be some of the

5   most gruesome is the statement in here that they would smell

6   blood in the air.  Now, these are all statements that were

7   unsolicited, made by the undercover employee.  And this is part

8   of why I objected and I wanted the whole story put into the

9   Presentence Report about these conversations.  I think context

10  is highly relevant.  I find those statements shocking.  I find

11  those statements concerning.  I am sure the Government is going

12  to say, well, when you are undercover you do what you can.  We

13  are trying catch the bad guys.  But those statements are as

14  vile or more vile than anything they have attributed to

15  Mr. Gregerson.

16      Your Honor, the Court knows Mr. Gregerson is a first

17  offender. The Government seems to brush that aside.  I think

18  it's highly relevant.  The Court should know because he didn't

19  have prior felonies, the majority of firearms and ammunition,

20  the knives, the equipment that he had which is so troubling to

21  Government, he all purchased legally, he purchased in his name

22  with the exception of the straw purchase pistol.  And, in fact

23  they were able to follow these transactions through on-line

24  vendors or Amazon, things like that.  They also followed him to

25  local gun stores like Dunham's or something and saw him filling

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 42

1   out paperwork in his name.  So he bought these things the way

2   you are supposed to.

3        Mr. Gregerson is a family -- he has a close family.  They

4   are here. His mother and father is here.  His wife is here.

5   His father-in-law is here.  They have stood by him.  This case,

6   the time that he has been incarcerated, and we have full

7   recognition that he's going to serve time still, some amount of

8   time when he leaves court today.  It has a destructive impact

9   on him and his family as well.  And, your Honor, I think that

10  for all those reasons, a sentence of 37 months and concurrent

11  sentence of 6 months will achieve the goals of sentencing.

12  It's warranted.  And I would ask the Court to not impose any

13  upward variance or departure in this case.

14           **THE COURT:**  Does your client wish to speak?

15           **THE DEFENDANT:**  I just stand by the Plea Agreement I

16  submitted and the remarks from my lawyer.

17           **THE COURT:**  Okay.  Anyone else have anything to say

18  before I decide on the sentence?

19           **MR. THOLEN:**  I don't, your Honor.

20           **MS. CORKEN:**  Your Honor, I would just note that the

21  defendant's guilty plea did include relevant conduct related to

22  the components to assemble the grenades, that is 37-millimeter

23  shells and buckshot.  And that as part of the Rule 11 as well

24  as the Plea Hearing, the defendant acknowledged his intent to

25  assemble those components into destructive devices.

Page 43

1      **THE COURT:**  Thank you.  Would you bring your client

2   to the lecturn, please?

3      **MR. THOLEN:**  Yes, your Honor.

4      **THE COURT:**  And I respect your decision not to say

5   anything in addition to what has been said.  It's my turn to

6   talk and I have to go through the rules in terms of sentencing.

7      And the first rule is to consider at least as I interpret

8   the higher courts and Congress, is to consider the guidelines.

9   While they are advisory they are also important and everyone

10   myself included agrees that Category One is reflecting your not

11   having any prior felony convictions and Level 21 as calculated

12   by the Presentence Report writer is accurate and it results in

13   a guideline range the same as anticipated by the Rule 11.  That

14   guideline range is 36 to 46 months.

15      **MR. THOLEN:**  37, Judge.

16      **THE COURT:**  37 months.  I'm sorry.  I don't recall

17   but I think I accepted the Rule 11 Agreement.  If I did not, I

18   accept it now.  And that affectively allowed the Prosecutor to

19   do exactly what they have done or she has done and that is ask

20   for an upward departure to 60 months.  And I am obviously

21   considering that as well as the range that is recommended.

22      I also have to consider the congressional intent.  And

23   they have set forth a number of factors that I will discuss

24   starting with the seriousness of the offense.  Obviously, it's

25   a serious offense because it's called a felony.  And in our

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 44

1  system a felony is the top kind of crime except for treason or

2  I guess treason or capital offenses.  And it's a ten year

3  felony which puts it in the middle to high end of the felony

4  range so both those points lead me to the conclusion of what

5  you have pled guilty to is a serious offense.

6      In terms of general deterrence, that refers to deterring

7  other people who might be inclined to do what you have done in

8  each of these cases.  And, quite frankly, the most effective

9  deterrence in this case has already been done and that is by

10  the arrest and all the publicity that was engendered by every

11  stage of your going through the system so that people thinking

12  of procuring an explosive device or people thinking of getting

13  a weapon, using a straw person, will know that another person,

14  that is you, have been charged with two felonies, both of them

15  ten year felonies, and are facing a significant amount of

16  prison time.  And I should indicate that -- well, I will get to

17  that in a minute.

18      I should indicate that in terms of special deterrence,

19  that is, will you be deterred from doing this in the future, I

20  don't think anything I can do will change what is described as

21  a collector's hobby by the defense and is described as

22  collecting weapons for future use.  If it is, in fact, a hobby,

23  you are entitled to do that.  If, in fact, it is for actual

24  use, obviously you are not entitled to do that.  I don't know.

25  I'm not a mind reader.  I think the Government when they

Page 45

1  decided what to charge you with recognizes that this is not a

2  life offense which tells me that they use their discretion and

3  their experience of their agents to determine what would be the

4  appropriate charge, and, in addition, what the appropriate plea

5  agreement would be.  And that gives me some guidance as does

6  your attorney's presentation on your behalf.  And if, in fact,

7  your language, and the court record has been quoted as, one,

8  accurate, and, two, meaningful, the only way to deter you would

9  be to put you in prison for the rest your life.  And that is

10  not what anyone has decided is appropriate in this case,

11  neither side, nor have I.

12      In terms dangerousness, I think what I just said applies

13  to dangerousness.  I don't know how dangerous you are but I

14  know that your conduct to this date has not created an action

15  event that could be called dangerous.  The coming together of

16  your religious slash political beliefs, you are entitled to in

17  the coming together of your procurement of most of the weapons

18  that you have collected are legal.  And it is very easy to

19  conflate the two but under our system of law that is not the

20  way it's done.  And I respect your rights and I respect the

21  Government's right to exercise their discretion.  And part of

22  my respect for your rights is after listening to your attorney

23  reminding me of what is in the Constitution.

24      In terms of disparity which was raised, I already

25  indicated that I do look at a much broader pool than our local

Page 46

1    interpretation of co-defendants.  However, the range is so

2    scattered to matter what sentence I impose would be disparate,

3    that is, unequal to some other sentences in some other

4    jurisdictions for a similar charge.  In other words, the range

5    of people involved, what they have done, what they have said

6    and so on is vast.  And while I acknowledge it's important not

7    to have diametrically opposed sentencing, I don't think that is

8    a factor that helps me a whole lot.

9        Care and treatment is something that your attorney has

10   raised.  It's been raised somewhat in the Presentence Report

11   when your attorney talks about you're talking, I think the

12   quote was, crap, that may reflect a lot of different things I'm

13   not qualified to determine.  But included would be a compulsive

14   obsessive behavior that is perfectly legal and part of it could

15   be interpreted as a much more dangerous thing.  And as a result

16   I am recommending in terms of care and treatment that you be

17   evaluated at the Bureau of Prisons for mental status so that if

18   you do need some help that would be provided.  If you don't,

19   that is the end of it.

20       Your prior record is obviously very important.  While it's

21   unusual for me to have two felony cases at the same time, I

22   think we all know that the straw man case is much less serious

23   than the other case, possession of destructive devices.

24       In terms your work record, I am not sure how that comes

25   into play and I don't think after all that I have said it's an

Page 47

1    important factor.  And in terms your attitude, you have

2    accepted responsibility which is good.  And the rest that I

3    already said about my ability to, based on what you said and

4    done, predict where you are in terms of attitude, I don't think

5    I have to say any more.

6         Your family responsibilities.  It's wonderful that you

7    have a five year old and as a matter of common sense, the

8    collection that you claim you are doing has to be impacting

9    your ability to support your wife and child and this is

10   something you should consider over the next period of time so

11   that when you get out you will put it in perspective and accept

12   the choices you have to make.  And there are programs in prison

13   which we will talk about you about, life skills and how to

14   survive, and one of them is how to spend and budget your money

15   so that your family should come first.  And I am recognizing

16   you are not in great financial shape.  And I am recognizing you

17   are 30 years old which plays into and emphasizes the fact you

18   don't have any prior contacts with the law.  That helps you.

19   Also at the age of 30, the studies show that a certain wisdom

20   and maturity is beginning to blossom.  And I would note that

21   from all I read about you, you are obviously a smart, capable

22   person who should be able to set priorities and survive without

23   getting into trouble again, without succumbing to whatever your

24   beliefs are in terms of taking action and whatever your

25   survival instincts are have to include a recognition of the

Page 48

1    importance of your five year old and your wife.  The fact that

2    you have your parents supporting you and your family supporting

3    you obviously indicates that you have not been completely

4    absent in doing family responsibilities.  But what I have just

5    said indicates that you could do better.  You have to go to

6    prison for what you have done.  And I'm ready to impose

7    sentence unless anybody has anything they want to say to

8    correct anything I have said.  Government?

9           **MS. CORKEN:**  No, your Honor.

10          **THE COURT:**  Defense?

11          **MR. THOLEN:**  Just so the Court knows, he has twin

12   sons so has two sons.  They are both five, Judge.

13          **THE COURT:**  It makes it even more important how you

14   allocate your resources for the benefit of your family.  And

15   thank you for correcting that.  Anything you want to say on

16   your own behalf at this time?

17          **THE DEFENDANT:**  No, Judge.

18          **THE COURT:**  Okay.  This is going to take a few

19   minutes because there are two Counts involved.  And while I'm

20   reading from a script the decision as to what your sentence

21   will be and is going to be is made after I listened to all

22   sides in the case.

23        Pursuant to the Sentencing Reform Act of 1984, the Court,

24   considering the sentencing guidelines which I already discussed

25   and the factors contained in the Congressional Statute 18 USC

Page 49

1   Section 3553 paren small A which I also already discussed,

2   hereby commits the defendant to the custody of the United

3   States Bureau of Prisons for a term of 45 months on Count One

4   of docket 16-20552, and be placed on supervised release for a

5   term of 36 months on that docket and impose an assessment of

6   $100 which is due now.

7        As to docket number 202 -- excuse me -- 17-20235 which has

8   been referred to as the straw man Count, it is the sentence of

9   the Court of nine months which shall be run concurrently as per

10  the Rule 11 Agreement, and supervised release.  There will also

11  be 36 months which will run concurrently and a special

12  assessment of a hundred dollars will be due immediately for a

13  total of $200.  I am not imposing a fine or the costs of

14  incarceration or the costs of supervision due to your financial

15  condition.  The mandatory drug testing condition is suspended

16  based on my determination that you pose a low risk of future

17  substance abuse.  I should indicate, first of all, I should ask

18  counsel does he have a choice as to where he wants to serve his

19  time?

20             **MR. THOLEN:**  We would ask the Court to recommend

21  Milan.  It's physically the closest facility to where his

22  family resides.

23             **THE COURT:**  All right.  I do recommend Milan.  I

24  should explain that is simply a recommendation.  The Bureau of

25  Prisons will decide and I will ask the Bureau of Prisons to

Page 50

1   inform me of what their decision is.

2          **MR. THOLEN:**  Thank you, Judge.

3          **THE COURT:**  Also recommend that you be evaluated for

4   mental health needs and if it's determined that's necessary,

5   that you be provided with mental health treatment.  But, again,

6   that is a recommendation and I'm not in charge of the Bureau of

7   Prisons.

8          While on supervision you shall abide by the standard

9   conditions as adopted by the United States District Court for

10  the Eastern District of Michigan and shall comply with the

11  following special conditions.

12         One, you are prohibited from using a computer during the

13  term of supervised release with the exception of and solely for

14  legal research, outside employment, or for specific class

15  assignments if you are in school at an accredited educational

16  institution or you may use it to send or receive typed e-mail

17  messages without attached electronic files and images embedded

18  in the body of the message, and for other use as approved by

19  the probation officer.  You shall access the internet only

20  through one internet capable device.  All other internet

21  capable devices such as cellular phones and gaming consoles

22  shall not have the internet connected.  You are prohibited from

23  accessing any on-line computer service at any location

24  including but not limited to public libraries, internet cafes,

25  and places of employment or education without the permission of

Page 51

1   the probation officer.  And you shall the provide probation

2   officer, we call them probation officers.  In the state they

3   are called parole officers.  You shall provide them with

4   accurate information about all computer systems, hardware,

5   software, and all passwords and internet service providers that

6   you have potential access to and abide by all rules of the

7   Probation Department Computer Monitoring Program.  And this

8   is -- I guess this is the day of redundancies.  This is

9   redundant.  You shall only access a computer approved by the

10  probation officer.  You shall consent to the probation officer

11  conducting periodic announced examinations of all computer

12  systems which may include computer monitoring software, period.

13  It says at defendant's expense, but you don't have to pay for

14  that.

15      For the purpose of accounting -- and this is four -- for

16  the purposes of accounting for all computers, hardware,

17  software, and accessories you shall submit your personal

18  residence computer and/or vehicle to a search conducted by the

19  Probation Department at a reasonable time and manner.  You

20  shall inform other residents that the premises and your

21  computer maybe subject to a search pursuant to this condition.

22  You shall provide the probation officer with access to any

23  requested financial information including billing records,

24  telephone cable, internet, satellite and so on and any

25  necessary codes to access that information.  Do you have any

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 52

1    questions?  Counsel?

2            **MR. THOLEN:**  No, your Honor.

3            **THE COURT:**  Your client?  Defendant?

4            **THE DEFENDANT:**  No.

5            **THE COURT:**  Government?

6            **MS. CORKEN:**  Your Honor, you may have done this.  I

7    did not hear though myself whether you accepted both Rules

8    Elevens.

9            **THE COURT:**  I will accept both Rule Elevens.

10           **MS. MARION:**  Thank you, your Honor.

11           **THE COURT:**  Okay.  And any objection to the sentence

12   from either side?

13           **MS. CORKEN:**  No, your Honor.

14           **MR. THOLEN:**  No objection from defense, your Honor.

15           **THE COURT:**  All right.

16           **PROBATION OFFICER:**  Your Honor, excuse me.  As a

17   matter of housekeeping, is the destructive device -- that was

18   Count Two?

19           **THE COURT:**  Yes.

20           **PROBATION OFFICER:**  I believe the court said Count

21   One.

22           **THE COURT:**  Okay.  That is true.  And did I say for

23   what I consider Count Two which is a Virginia case -- I don't

24   recall if I mentioned a number of months.

25           **PROBATION OFFICER:**  You did.

Page 53

1          **MR. THOLEN:**  You did, Judge.

2          **THE COURT:**  All right.  It's a long day.  I do have

3     to tell you about your right to appeal which is required by

4     court rule and statute.  And if you cannot afford an appeal the

5     Court will provide you with counsel and the transcript and

6     waive the filing fee.  There is a ten day time period to file

7     your papers.  Your attorney and my case manager will provide

8     you with the necessary form requesting it but I should also

9     note part of the Plea Agreement is that if the plea -- if the

10    sentence is below 60 months you waived your right to appeal so

11    that while technically you have the right, more likely than not

12    if you were to exercise it and something were filed at the

13    Court of Appeals they would dismiss your appeal as having been

14    waived.  And it's a lot of time.  It's a lot of things that you

15    have to think about.  I commend both sides for their treating

16    this as an individual case and not using the facts of the case

17    to generate media attention or public dispute.  The fact that

18    both sides came together on worked out with your approval a

19    Rule 11 Agreement tells me that the system is working.  You are

20    entitled to believe the sentence is way too high.  And if you

21    do believe that you would not be the first person entering

22    prison who believes that.  And you might be right.  But the

23    goal of the system and what should be your goal while you are

24    serving your time is to be able to control your anger at the

25    system, at the sentence that I imposed, and anyone else you

*Sentencing Hearing*
*Wednesday, August 30, 2017*

Page 54

1  want to be angry at and that anger should be at least more

2  under control each day you were there.

3      You will be offered some choices in terms of programs, in

4  terms of jobs.  None of them will be your first choice and the

5  jobs that may be offered are at the bottom based on seniority.

6  But do them and with the understanding that it may help you

7  pass the time a little bit faster and it may teach you some

8  skills and some realism.  And I am not suggesting that you have

9  to modify any of your religious beliefs, only how you act upon

10  them.  And will I wish you luck.  We are done.

11          **MR. THOLEN:**  Thank you, Judge.

12          **MS. CORKEN:**  Thank you, your Honor.

13                       -    -    -

14

15

16

17

18

19

20

21

22

23

24

25

1          **C E R T I F I C A T I O N**

2              I, Lawrence R. Przybysz, official court reporter

3      for the United States District Court, Eastern District of

4      Michigan, Southern Division, appointed pursuant to the

5      provisions of Title 28, United States Code, Section 753,

6      do hereby certify that the foregoing is a correct

7      transcript of the proceedings in the above-entitled cause

8      on the date hereinbefore set forth.

9              I do further certify that the foregoing

10     transcript has been prepared by me or under my direction.

11

12
       s/Lawrence R. Przybysz
13     Official Court Reporter

14                                  -   -   -

15

16

17

18

19

20

21

22

23

24

25