UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,           Case Nos.  16-CR-20552
                                                 17-CR-20235[1]

   v.

                                   Hon. Terrence G. Berg

SEBASTIAN GREGERSON,

              Defendant.

_____/

**GOVERNMENT'S RESPONSE OPPOSING DISMISSAL OF
SUPERVISED RELEASE VIOLATION NUMBER 1**

Defendant began his 3-year supervised release term on October 10, 2019. For more than two years, Defendant repeatedly lied to and deceived his probation officer, surreptitiously gathered dangerous weapons, amassed tactical equipment, and consumed violent extremist propaganda using the internet in violation of the terms of his supervised release.

---

[1] References to the record will refer to docket entries in Criminal No. 17-CR-20235.

In June 2021, special agents from the Federal Bureau of Investigation (FBI) alerted David Smith, Defendant's Probation Officer, to Defendant's prolific online activity with Amazon, Venmo, and eBay. Probation conducted a court-authorized search of the Defendant's home and vehicle on June 24, 2021, and found dangerous weapons, tactical equipment, publications on topics such as weapons, military, and police tactics, and three electronic devices.

On April 1, 2022, after the content of Defendant's three seized electronic devices were accessed and reviewed, Smith filed a Violation Report specifying four violations of Defendant's supervised release terms. (R. 30: Violation Report, 446-451). Violation Number 1 alleges a violation of standard condition number 10, which states that the defendant "must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers.)" (*Id*. at 447). Violations 2 through 4 relate to Defendant's violation of special conditions which restrict his use of computers and the internet.

(*Id.* at 448-450). A supervised release violation hearing has been scheduled for June 1, 2022.

Defendant moves to dismiss Violation Number 1 and alleges that the weapons and items seized from Defendant's residence by the Probation Department on June 24, 2021, were not "destructive devices" or "dangerous weapons". Defendant acknowledges that knives were, in fact, seized during the search of the Defendant's home, but argues that the knives seized are not "dangerous weapons" in this case because these items were not found on Defendant's person. (R.44: Def. Mtn. at 290).

Defendant's motion is meritless and should be denied.

## **Background**

On March 30, 2017, Defendant pleaded guilty to the unregistered possession of a destructive device for his possession of M67 fragmentary grenade bodies containing approximately 26 ounces of Composition B, a combination of the high explosives TNT and RDX, and grenade fuses, in violation of 26 U.S.C. §5861(d).[2] (16-CR-20552 – the grenade charge).

---

[2] Pursuant to the terms of his Rule 11 Agreement, the remaining three counts of the First Superseding Indictment charging receipt of explosive materials with intent to

Defendant also pleaded guilty to aiding and abetting false statements during the purchase of a firearm, in violation of 18 U.S.C. §§922(a)(6), 924(a)(2), and 2.[3] (17-CR-20235 – the firearm charge).

Defendant was sentenced to concurrent terms of imprisonment–45 months on the grenade charge and 9 months on the firearm charge– followed by concurrent 36-month terms of supervised release. Defendant commenced supervised release on October 10, 2019, and he returned home to live with his wife and two children.

In addition to the standard conditions of probation, Defendant was ordered to comply with several special conditions which proscribed his use of computers and internet connected devices (such as computers, tablets, smart phones, and gaming consoles) except in very limited circumstances and only after he obtained explicit authorization from Probation Officer David Smith. (R.27: Judgment, 387). Smith met with

---

harm, 18 U.S.C. §844(d) (count one), unlicensed receipt of explosive materials, 18 U.S.C. §842(a)(3)(A) (count three), and unregistered possession of a destructive device, 26 U.S.C. §5681(d) (count four), were dismissed.

[3] Pursuant to the terms of his Rule 11 Agreement, the remaining three counts of the Indictment charging conspiracy, 18 U.S.C. §371 (counts one and two) and aiding and abetting false statements during the purchase of a firearm, 18 U.S.C. §§922(a)(6), 924(a)(2), 2, (count three) were dismissed.

4

Defendant upon his release from custody and explained to him the terms and conditions of his release. Smith also provided Defendant a copy of his judgment, which contained the mandatory, standard, and special terms and conditions of his supervised release. Defendant understood that he could seek permission to possess one internet connected device–such as a phone, or tablet, or computer–as long as Probation's monitoring software was installed. Defendant expressly declined, advising Smith he would <u>not</u> access the internet, or obtain and use any internet connected device. Defendant produced an Alcatel "flip phone" and claimed the phone did not have internet connectivity.[4]

Defendant thereafter engaged in a pattern of deception and dishonesty. In subsequent meetings and discussions with Smith, Defendant repeatedly told Smith that he had not used or obtained any internet connected device, and that he did not intend or plan to do so. Defendant made these false statements while he was using several internet-connected devices, including an Amazon Fire Tablet ("Fire

---

[4] A review of data extracted from Defendant's Alcatel "flip phone" show he first used the device to search the internet in April 2020, just a couple weeks after the COVID-19 pandemic suspended most in person interactions, including probation home visits.

tablet"), his flip phone, and an Apple iPad that appears to belong to his wife. Smith knew Defendant had a flip phone (which Defendant claimed was not internet enabled), and Smith knew Defendant's wife had an Apple iPad (which both Defendant and his wife understood was off limits to Defendant). Smith was <u>not</u> aware of Defendant's possession and use of the Fire Tablet, and Defendant not only failed to disclose its existence, but secreted the Fire Tablet in a faraday bag[5] to impede its discovery. As detailed later, most of Defendant's internet activities occurred on the Fire Tablet.

For approximately 20 months, Smith relied on Defendant's repeated assurances that he was not accessing the internet and Smith believed Defendant was complying with the terms and conditions of his supervised release. In June 2021, FBI contacted Smith to alert him to Defendant's prolific internet activity. FBI learned Defendant had created and/or reactivated online accounts with Amazon, eBay, and Venmo, and that he used these accounts to purchase hundreds of items. Many of the Defendant's purchases were of movies, toys, beef jerky, and

---

[5] Faraday bags are designed to block computer signals so the devices cannot be detected electronically.

clothing, but interspersed among these purchases, were purchases of dangerous weapons like road spikes and tactical knives, tactical equipment, radical jihadi propaganda recordings, and books on topics like creating and using improvised weaponry.

## Defendant's Possession of Dangerous Weapons

Probation sought and obtained authorization from District Court Judge Arthur Tarnow to search the Defendant's home and vehicle. The search was conducted on June 24, 2021, and three electronic devices were seized–Defendant's Alcatel "flip phone", an iPad that appears to belong to Defendant's wife, and the Fire Tablet enclosed in a protective faraday bag. Numerous additional items–including dangerous weapons, tactical materials, and publications–were also seized during the search. Notably, *not* all of the items of concern that Defendant purchased from Amazon and/or eBay–such as a tactical knife known as a "United Cutlery Ranger Knife UC1445 Tanto Knife *Rangers Lead the Way", and a 16-CD set of recordings of the radical Al Qaeda cleric, Anwar Al-Awlaki–were located during the search. The following images depict *some* of the dangerous weapons and firearm-related items located and seized by Probation during the June 24, 2021, search:

7



1. Aardvark Tactical Military Caltrops (20 Road Spikes)



2. Gerber LMF II Survival Knife – Coyote Brown with Sheath and Leg Straps



3. Gerber tactical fixed blade knife and sheath with neck rope



4. Tactical fixed blade knife and sheath with neck rope



5. Knife



6. Bayonets (2)



7. Arrows (10)



8. Glock 9mm (unloaded) Ammunition Magazines (10)



9.  AK-47 (unloaded) Ammunition Magazine

## Defendant's Online Activity After the June 24, 2021, Search

After the June 24, 2021, search, FBI obtained additional records from eBay which show Defendant continued to violate the terms of his release by using the internet to purchase, among other things, books and/or manuals on firearms and shooting techniques, unarmed fighting techniques, and police militarization. Defendant also purchased a Radio Frequency Identification, or RFID shielding passport pouch, a military compass and pouch, and a tactical signal blocking cellphone case.

Defendant did not disclose his internet use to Probation, and he did not seek authorization to use one internet connected and monitored device, as required by the terms of his supervised release. Instead,

12

Defendant continued his clandestine use of the internet further demonstrating his flagrant disregard of the court's directives. Like before, Probation was unaware of Defendant's contumacious behavior until FBI alerted Smith to Defendant's eBay purchases.

### Data Extracted from Defendant's Electronic Devices

Defendant went to great lengths to disguise his internet use from his probation officer. Accessing the data was important to understanding the nature and full scope of Defendant's unmonitored online activities. Probation attempted to access and extract data from the three electronic devices seized from Defendant's home during the June 24, 2021, search, but these efforts were unsuccessful. When asked, Defendant provided Smith with passwords for the devices, but the passwords were inaccurate, further inhibiting efforts to access the data on the devices.

Probation obtained court authorization to submit the devices to the FBI for analysis. The devices were given to FBI on October 18, 2021. By late December 2021, the FBI had successfully bypassed passwords, accessed and extracted data from Defendant's flip phone and the Apple iPad. The Fire tablet presented technical challenges and data was not

13

extracted until March 14, 2022. A review of the data showed Defendant used the internet on the flip phone and the iPad, but most of his online activities occurred on the Fire Tablet.

FBI's review of the extracted data on Defendant's flip phone showed he first accessed the internet in April 2020 to access websites. Defendant also used the internet to access eBay and Amazon accounts and track packages. There were numerous images of knives and tactical gear cached[6] within in the device.

FBI's review of the extracted data on the Apple iPad showed that although the device appeared to be used primarily by his wife, there was evidence of Defendant's use of the device. For instance, agents found images of firearms, tactical gear, and searches for Swedish to English translations. Defendant's interest in the Swedish language became apparent later, during the March 2022 review of Defendant's Fire Tablet, which showed Defendant had created and used a fictitious online identity as a Swede named "Swen Gunnardsen".

---

[6] "Cached" data are files, scripts, images, and other multimedia stored on a device after opening an application or visiting a website for the first time.  This data is then used to quickly gather information about the application or website every time it is revisited, reducing load times.

14

FBI's review of the Amazon Fire Tablet showed Defendant regularly used this device to surf the internet, make purchases, chat on dating websites using a false identity, and download publications. Agents found that as early as December 17, 2019–just two months after he first told Smith he did not have, and would not use or obtain, any internet connected devices–Defendant downloaded the TOR application, a dark web internet browser that is used by individuals seeking online anonymity. Defendant also downloaded and stored extremist propaganda promoting violent attacks against civilians and governments across the world as well as promoting hostage taking and the execution of hostages should extremist demands not be met. Defendant's online activities included the creation of Google, Gmail, and Instagram accounts. Defendant also downloaded numerous dating applications, such as "Blendr," "Skout," "MeetMe," "Grindr," "Ashley Madison," "Positive Singles," "Taimi" and "Tinder." Defendant created a fictious online identity as a Swede named "Sven Gunnardsen" when creating his Instagram account and assumed this false identity when chatting with individuals on the "Blendr" application. Agents also found an application that tested the efficacy of the faraday bag.

15

## **Facts Underlying Defendant's 2017 Convictions**

To appreciate the very serious nature of these violations, it is important to put Defendant's activities in context by examining the facts surrounding Defendant's 2017 convictions.

The FBI's investigation of Defendant commenced in 2015 after a citizen, a fellow Muslim, told the FBI that Defendant repeatedly expressed support for the Islamic State of Iraq and al-Sham (ISIS) and its violent methods and continually accessed ISIS-related web sites.[7]

ISIS, "an organization whose brutality is shocking even by the standards of terrorism," (*United States v. Ahmed*, 107 F.Supp.3d. 1002, 1005 (D.Minn. 2015) has inspired numerous individuals to commit terrorist acts resulting in mass casualties in the United States and elsewhere.

The source told FBI that Defendant indicated that he wanted to move his family to ISIS-held territory and had evicted his wife's relatives from his home during a visit, claiming that they were not true Muslims or "takfeer." The source advised that Defendant claimed to

---

[7] See R: 14: Gov't Sentencing Memo for a more detailed recitation of the facts underlying Defendant's convictions.

have grenades and a bazooka (a shoulder-type rocket launcher).
Components to construct grenades, as well as a 37mm grenade
launcher, were later seized from Defendant's home in July 2016.

The FBI's investigation showed that Defendant avidly consumed
and disseminated ISIS's violent propaganda. Defendant downloaded
onto his iPad every issue of ISIS's former official English language
publication, *Dabiq*, published up to the time of his arrest and regularly
disseminated *Dabiq* to others. Law enforcement also found 96 CD's
containing Anwar Al-Awlaki's lectures in the Defendant's residence in
2016 and Defendant told an FBI undercover agent that he had listened
to all of Anwar Al-Awlaki's lectures. Anwar Al-Awlaki was a key leader
in al-Qaeda in the Arabian Peninsula (AQAP) who was killed in a U.S.
drone strike in 2011.[8]  In his publications and videos, Al-Awlaki called
for violent attacks against America, justifying such attacks in the name
of extremist ideology. Most, if not all, of the terrorists who committed

---

[8] Al-Awlaki played an operational role in the plot by Umar Farouk Abdulmutallab
to bomb a U.S. airliner over Detroit on Christmas Day, 2009. *United States v.
Abdulmutallab*, Crim. No. 10-cr-20005-01 (E.D.Mich.), Gov't Sentencing Memo.,
Supp. Factual Appx. at 12-14.

major attacks in the United States over the past dozen years have been consumers of Al-Awlaki's violent messages.[9]

Defendant viewed himself as a soldier and, consistent with ISIS's teachings, he took extensive steps to carry out the central ISIS directive to its followers in western countries. That is, to equip themselves with weaponry, to cache and stockpile weapons, and to otherwise prepare themselves for battle in the ongoing war with their "enemies."

Defendant amassed an arsenal of weapons. He possessed ten firearms, consisting of eight long guns (assault rifles and shotguns) and two handguns, nearly 8,000 rounds of ammunition, including several hundred rounds of AK-47 ammunition, an underground ammunition

---

[9] Open-source information confirms that each of the perpetrators of the major terrorist attacks in the U.S. indicated below was a consumer of Al-Awlaki's lectures or writings:
- Umar Farouk Abdulmutallab, Detroit Underwear Bomber (2009)
- Faisal Shahzad, Times Square Bombing (2010)
- Tsarnaev brothers, Boston Marathon Bombing (2013)
- Rizwan Farook & Tashfeen Malik, San Bernardino Shooting (2015)
- Elton Simpson, Muhammed Cartoon Attack (2015)
- Muhammad Abdulazeez, Chattanooga Recruiting Center Shootings (2015)
- Abdul Artan, Ohio State University attack (2016)
- Ahmad Khan Rahimi, NY and NJ Bombings (2016)
- Omar Mateen, Orlando Night Club Shooting (2016)
- Mohammed Alsharani, Naval Air Station Pensacola (2019)

storage cache, a 37mm grenade launcher and 37mm flare rounds. He also possessed numerous multiple fixed-blade knives of significant length, a hatchet, two machetes, as well as tactical gear, tactical training materials, a balaclava mask, commercial grade road spikes, and an AK-47 training video. Similar to his conduct on supervised release, Defendant used the internet and online marketplaces like Amazon and eBay to acquire most of these items.

During the investigation, Defendant exhibited a strong interest in grenades and grenade-related weapons. In conversations with the FBI undercover, Defendant exhibited in-depth knowledge about grenades, including how to make homemade illegal grenades. Defendant tasked the undercover with using his network to obtain M67 fragmentary grenades. During a controlled sale, Defendant purchased M67 fragmentary grenades from an undercover agent in exchange for a firearm.  The M67 grenade has a killing radius of 16.4 feet and a casualty-producing radius of 49.2 feet, although fragments can disperse as far as 754.6 feet.

During the period of Defendant's incarceration, the caliphate's physical territory diminished significantly but ISIS's ultimate

19

ideological goal—the creation of a caliphate through a global jihad—endures and ISIS's propaganda continues to encourage westerners to engaging in lone wolf attacks in the homeland. There is no evidence to suggest Defendant's support for ISIS and its ultimate ideological goal has diminished or changed. Rather, Defendant's conduct during supervised release suggests he is continuing on the same path he was on before his conviction.

## <u>Argument</u>

Defendant moves to dismiss Violation Number 1 and argues that the knives and road spikes found during the June 2021 search are not "destructive devices" or "dangerous weapons" under the circumstances of this case. (R. 44: Def. Mtn. at 489-90). Defendant's motion fails as a matter of law, fact, and common sense.

The United States Sentencing Guidelines Section 1B1.1, Application Notes, define the terms "dangerous weapon" and "destructive device". A destructive device "means any article described in 26 U.S.C. § 5845(f) (including an explosive, incendiary, or poison gas--(i) bomb, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces, (iv) missile having an explosive or incendiary charge

20

of more than one-quarter ounce, (v) mine, or (vi) device similar to any of the devices described in the preceding clauses). U.S.S.G. §1B1.1 App. Note 1(G).

A dangerous weapon is defined as: "(i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun)." U.S.S.G. §1B1.1 App. Note 1(E).

Road spikes, or caltrops–like the ones possessed by Defendant in this case may not be destructive devices, as defined in the Sentencing Guidelines, but they are dangerous weapons. *See United States v. Olarte-Rojas*, 820 F.3d 798, 803 (5th Cir. 2016) (caltrops satisfy the Sentencing Guidelines' definition of "dangerous weapon" because placing a caltrop on the ground "could easily lead to death or serious injury."). These commercial grade tire spikes are constructed from heavy grade hardened steel plate, industrial grade welds, and are

designed to disable a car or truck tire.[10] Notably, the road spikes Defendant acquired while on supervised release were identical to the ones that he possessed in 2016 during the underlying offense conduct.

Moreover, there is considerable evidence that Defendant possessed multiple dangerous weapons in violation of standard condition number 10. Knives–particularly the knives at issue here–, bayonets[11], and arrows, all are clearly instruments not only capable of inflicting death or serious bodily injury but are specifically designed for this purpose. *See United States v. Alston*, 27 F.3d 567, *7 (6th Cir. 1994) ("there is no doubt" that the folding knife with blade slightly over 3½ inches possessed by defendant "could be used to inflict 'death or serious bodily injury.'"); *see also United States v. Smith*, 561 F.3d 934, 939 (9th Cir. 2009) (en banc) (stating when discussing 18 U.S.C. § 113(a)(3) that a knife was an "[i]nherently dangerous weapon").

---

[10] https://orbitaltactical.com/product/aardvark-tactical-caltrops-tire-spikes-lot-of-10/

[11] The Merriam-Webster online dictionary defines a bayonet as "a steel blade attached at the muzzle end of a shoulder arm (such as a rifle) and used in hand-to-hand combat."

Multiple courts have found that a knife can constitute a dangerous weapon under the terms of a defendant's supervised release.[12] *See United States v. Wiley*, 703 F. App'x 950, 952 (11th Cir. 2017) (per curiam) (finding a folding knife with a three-inch blade constituted a dangerous weapon under Florida law for purposes of revocation of supervised release); *United States v. Tumea*, 810 F.3d 563, 566-67 (8th Cir. 2016) (explaining that a knife designed to look like a carabiner constituted a dangerous weapon under the terms of the defendant's supervised release); *United States v. Thomas*, No. 06-CR-048-WMC-01, 2011 WL 4356231, at *1 (W.D. Wis. Sept. 16, 2011) (finding defendant's possession of a steak knife in his suitcase constituted a dangerous weapon for purposes of revocation of supervised release); *United States v. Alston*, No. 98-CR-176A, 2007 WL 2746901, at *5 (W.D.N. Y Sept. 19, 2007) (concluding that a knife with a three-to-four-inch blade was a dangerous weapon under terms of defendant's supervised release); *United States v. Pangelinan*, 2007 WL 1175033, *1-3 (D. Guam Apr. 23,

---

[12] In his brief, Defendant misapprehends the holding in *United States v. Wallace*, 665 Fed. Appx. 261 (4th Cir. 2016) an unpublished Fourth Circuit case. (R. 44: Def. Mtn. at 490). The Court in *Wallace* affirmed the lower court's revocation of supervised release and imposition of a sentence well above the advisory guideline range without any discussion of whether knives constituted dangerous weapons.

2007) (holding that a three-inch pocket knife and collapsible steel baton were dangerous weapons under the terms of defendant's supervised release).

Defendant urges the court to consider how the knives were utilized and stored before deciding whether the knives qualify as dangerous weapons. While the circumstances surrounding a defendant's possession of a dangerous weapon may aggravate or mitigate the severity of a defendant's supervised release violation, a defendant's subjective intent when possessing dangerous weapons does not alter the character of the weapon itself. Defendant's argument was expressly rejected by one district court, which reasoned:

> the problem with counsel's suggestion is that it seemingly would permit the Defendant to possess what otherwise is a clear weapon such as a stun gun or crossbow provided he had no nefarious intention of using those items. This clearly is not what is intended. Possession can be enough to find a violation.

*United States v. Pangelinan,* 2007 WL 1175033 at *3 (D. Guam, Apr. 23, 2007).

Defendant's mere possession of these dangerous weapons is sufficient to find he violated his supervised release terms. Even if the

24

court were to consider the surrounding circumstances to determine whether his possession of these weapons was, as Defendant suggests, for everyday use, it is clear that Defendant's possession of these weapons was anything but legitimate.[13]

It is difficult to imagine a harmless or "everyday use" for caltrops, bayonets, and arrows. Likewise, knives on neck ropes designed to be hidden under clothing, and tactical fixed blade survival knives with sheaths and leg straps make them unlikely kitchen utensils.

Defendant's possession of these weapons, combined with the manner in which he acquired them–slowly and surreptitiously–exhibit a deliberate effort to replenish the stockpile of weaponry that was seized from him in 2016. Defendant was well aware of the prohibition on possessing these items, so he hid his purchase and stored all but one of them in the basement to avoid detection from his probation officer. He kept one of the tactical knives, depicted in photo number 3, in his

---

[13] Probation Officer Smith will testify that three of the four knives (including the plain knife depicted in photo 5), the bayonets, arrows, and caltrops were all found co-located in the basement along with some other tools during the June 24, 2021, search. One of the tactical knives (depicted in photo 3), and books were found in Defendant's bedroom, and the electronic devices were found hidden within the sofa cushions in the Defendant's living room.

bedroom. This self-defense weapon[14] is attached to a neck rope and may be hidden underneath clothing, making it readily accessible.

The facts here do not support any innocuous, or legitimate possession of the multiple dangerous weapons found in Defendant's possession. Rather, the facts show Defendant knowingly and intentionally violated standard condition number 10.

## Conclusion

Far from being innocuous, Defendant's conduct on supervised release is alarming because of its similarities to the behavior that led to his underlying conviction for explosives and firearms charges – behavior that was motivated by his support for a foreign terrorist organization and desire to engage in violent attacks in the United States.

For more than 2 years, Defendant has willfully failed to comply with court ordered conditions of release. He lied to his probation officer, disguised his activities and resumed his earlier pattern of stockpiling dangerous weapons, firearm magazines, tactical equipment and

---

[14] The Gerber Ghoststrike Punch dagger neck knife is advertised as a "skeletonized t-handle fixed blade designed for self-defense applications. The rubberized overmold grip features a diamond texture, providing superior control in critical situations." (https://rivercity-tactical.com/product/gerber-ghostrike-punch-daggar-neck-knife-30-001007n-made-usa-self-defense/).

clothing, tactical manuals and publications. He downloaded the TOR application, assumed a fictitious identity, downloaded violent jihadi propaganda, and replenished his supply of Anwar Al-Awlaki lectures. For these reasons and additional evidence that will be presented at the June 1, 2022 supervised release hearing, Defendant's motion to dismiss Violation Number 1 should be denied, his supervised release should be revoked, and Defendant should be sentenced to the two-year maximum term of incarceration.

Respectfully submitted,

DAWN N. ISON
United States Attorney

/s/ *Saima S. Mohsin*
Assistant United States Attorney
United States Attorney's Office
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9163
Email: Saima.Mohsin@usdoj.gov

Dated: May 23, 2022